**W. M. JACKSON, as Superintendent of Banks of the State of Georgia, Appellant,**

v.

**FIRST NATIONAL BANK OF VALDOSTA, Appellee.**

No. 21821.

United States Court of Appeals
Fifth Circuit.

July 22, 1965.

Eugene Cook, Atty. Gen., Benjamin L. Johnson, Asst. Atty. Gen., Atlanta, Ga., Joseph H. Kavanaugh, Baton Rouge, La., James F. Bell, Washington, D. C., Albert Sidney Johnson, Asst. Atty. Gen., State of Georgia, Atlanta, Ga., for appellant.

Sam U. Young, Jr., J. Lundie Smith, Valdosta, Ga., for appellee.

Waggoner Carr, Atty. Gen. of Texas, Hawthorne Phillips, First Asst. Atty. Gen. of Texas, Joe R. Long, Asst. Atty. Gen. of Texas, C. K. Richards, Sp. Counsel for J. M. Falkner, Banking Commissioner of Texas, amici curiae.

James F. Bell, Washington, D. C., Calvin Davison, Pogue & Neal, Washington, D. C., of counsel, amici curiae.

Before TUTTLE, Chief Judge, EDGERTON,* and SMITH,** Circuit Judges.

TUTTLE, Chief Judge:

This is an appeal from an order dismissing an action brought by the Superintendent of Banks of the State of Georgia against First National Bank of Valdosta, a national banking association. The Superintendent's action, filed in the state court and removed by the defendant to the federal district court, sought a declaration that First National could not lawfully open a drive-in banking facility 281 feet away from its main office and separated from that office by an alley and several buildings not owned by the bank, and an injunction against the opening of such a facility. After considering oral and written arguments, the district court vacated the temporary restraining order which had been entered against the bank and dismissed the complaint on the ground that the Superintendent was not a proper party plaintiff.

■ Prior to the opening of its disputed drive-in facility, First National had a main office and one branch office in Valdosta, a city of slightly over 30,000 population. The National Bank Act, which governs the operations of national banking associations, provides that:

"A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; * * *." 12 U.S.C. § 36(c).

"The term 'branch' as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business * * * at which deposits are received, or checks paid, or money lent." 12 U.S.C. § 36(f).

Thus, a national banking association is precluded from opening any office at which deposits are received, checks paid, or money lent unless a similarly situated state bank would be authorized under state law to open a similar office. In this way, Congress sought to insure equality between state and national banks regarding the establishment of branches. State

---

* Senior Circuit Judge of the D. C. Circuit, sitting by designation.

** Of the Third Circuit, sitting by designation.

of South Dakota v. National Bank of South Dakota, D.S.D.1963, 219 F.Supp. 842, 846.

Under Georgia law, an additional place of business located within the same city as its superior office "and which has obtained a permit to operate a limited banking service" is denominated a "bank facility." Ga.Code § 13–201.1(d). A drive-in window would ordinarily fit within this definition. New bank facilities may be established with permission of the Superintendent of Banks, but, according to Georgia Code § 13–203.1(c):

"the Superintendent of Banks may approve with respect to any municipal corporation now or hereafter having a population of 80,000 or under * * * not more than one of either a bank office or bank facility for each population unit of 40,000 or any fraction thereof * * *."

Therefore a state bank, located at Valdosta, already having one office or facility in that city, could not open another office or facility there. Consequently, First National likewise could not, under § 36 (c), open such a facility.

It is not so clear, however, whether § 13–203.1(c) precludes the opening of a new "drive-in teller facility" under the circumstances involved here. By regulations issued December 30, 1963, the Superintendent provided that a banking house could establish a "drive-in teller facility" which would not be considered an additional bank office or bank facility, "but rather as an expansion of the existing banking house," under either of two circumstances: (1) if the facility was "within the boundary lines of a single contiguous area of the property owned and/or leased and occupied as a banking house" by an existing bank or (2) if the facility is across a street, alley, railroad right-of-way or thoroughfare from an existing banking house and "is physically connected by an overhead passage or underground tunnel" to the existing bank.

When First National applied to the Comptroller of the Currency for permission to open the drive-in window in question, the Comptroller took the position that his approval was not necessary since, in his view, the drive-in facility was not a "branch office" but "an extension facility of the main office." The Superintendent, on the other hand, takes the position that since the drive-in facility is neither contiguous to nor otherwise physically connected with the main office, its establishment by First National is impermissible. In his petition filed in the state court, the Superintendent stated:

"That the question in controversy is whether a drive-in facility located upon property 281 feet removed from the property on which is situated the main office is to be considered as simply an expansion of the existing facility or as a branch office or facility, and whether such 'drive-in facility' is authorized to banks of the State of Georgia under the laws of the State of Georgia."

If such facilities are not authorized to Georgia banks under Georgia law, then, by virtue of § 36(c), they are not authorized to national banks by the National Bank Act.

The district court did not reach the merits, but dismissed the suit for want of a proper party plaintiff primarily in reliance upon a similar decision in South Dakota v. National Bank of South Dakota, supra. In South Dakota, the court held that the National Bank Act preempted state laws as to branching, so far as such laws are sought to be applied to national banks. Therefore, the State's attempt to enjoin the violation of *its own* law on branching by the national bank in question was disallowed on the ground that that law could not properly be applied to that bank. The court further held that, insofar as the State was seeking to enjoin a violation of the *federal* law on branching by the national bank in question, the State had no authority to enforce that federal law.

It is conceptually proper to divide the Superintendent's complaint into two branches, as the district court apparently

did, one challenging the new facility as a violation of state law and the other challenging it as a violation of federal law. The questions for determination under the first branch would be (1) Does the state law purport to apply to national banking associations? and (2) If so, is such application precluded by a preemptive federal law? The district court bypassed the first question and answered the second affirmatively. Under the second branch the inquiries would be (1) Is the Superintendent authorized under state law to proceed against national banking associations? and (2) If so, is he precluded from doing so by virtue of federal law? Again, the district court went directly to the second question, which it answered affirmatively. We believe the district court erred.

■ We start with the proposition that the source of First National's authority to open up the disputed drive-in window must be found in § 36(c) of the National Bank Act. That statute is explicit in providing that the substantive law of the state in which each national banking association is located fixes the bounds of such association's branching authority. We agree with the district court in this case and in South Dakota, supra at 846, that Congress did not have to give this effect to state law. But it is highly significant that Congress did give it such effect and that it did so pursuant to a strong and distinct "policy of equalization" for our dual banking system.

Since the substantive law which will be determinative of the merits of the controversy in this case is that of the State of Georgia, in the absence of any contraindicative federal policy, the remedial provisions of Georgia law should also be applicable. It is clear that the Superintendent is authorized to bring an action to enjoin a *state* bank for violation of the state's branching laws. See Georgia v. Gormley, 1938, 186 Ga. 128, 197 S.E. 274; Ga.Code § 13–208. As we read the Georgia law, we feel he is likewise authorized to proceed against *national*

banks for violation of Georgia's laws. Ga.Code § 13–208 provides that "The Superintendent * * * may bring a civil action to enjoin the violation of any provision of this Chapter * * *." Although Ga.Code § 13–201 expressly excludes national banking associations from the definition of the term "bank" as used in that Chapter, "unless the context otherwise indicates," that section specifically states that "[n]ational banking associations shall have the same, but no greater, rights under or by virtue of this Title and Acts amendatory and supplementary thereof, than is granted to banks and trust companies organized under the laws of this state." This provision is as much a "provision of this Chapter" which the Superintendent is expressly authorized to enforce as any other provision of the Act.

■ Thus the law of Georgia, resting on its own bottom, would authorize the suit by the Superintendent against a national bank for violation of Georgia's branching laws. In First National Bank in St. Louis v. State of Missouri, 1923, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486, the Supreme Court held that such a suit did not violate any paramount federal authority. We disagree with the district courts below and in the South Dakota case that the passage of § 36(c) has stripped the St. Louis case of its potency. That case very clearly stated that "national banks are subject to the laws of a state in respect of their affairs, unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies, or conflict with the paramount law of the United States." 263 U.S. at 656, 44 S.Ct. at 215. Since, by virtue of § 36(c), state law as to branching *is* federal law applicable to national banking associations, we cannot see how the application of that law would in any way interfere with the operation of national banks or conflict with federal authority.

■■ If, as a matter of Georgia law, the Superintendent of Banks was not authorized to bring any action against a

national banking association, nothing in the National Bank Act would supply that authority. But where there is authority to proceed against national banking associations, even if in terms it is only authority to proceed against violations of state law, the subsumption of state substantive law as the regulating principle for national banking associations concerning branching carries with it the right of the State Superintendent of Banks to see to it that that substantive law is enforced. This seems to have been the Supreme Court's view in First National Bank of Bay City v. Fellows, 1917, 244 U.S. 416, 37 S.Ct. 734, 61 L.Ed. 1233, which involved another portion of the National Bank Act which adopted state substantive law as the regulating principle applicable to national banking associations. That was a quo warranto action brought by the Attorney General of Michigan against a national bank challenging the authority of the bank to act as a trustee. Federal law provided that national banks could act as trustee only when such action would not be "in contravention of State or local law." The court upheld the authority of Congress to pass such an Act and also held that it was proper for a State Attorney General to test, in quo warranto proceedings, the power of a nationally chartered bank to engage in this particular form of activity. The court ruled:

> "But, without inquiring into the merits of the doctrine upon which the proposition rests, we think when the contention [that the State Attorney General lacks the authority to bring such an action] is tested by a consideration of the subject-matter of this particular controversy it cannot be sustained. In other words,

we are of opinion that, as the particular functions in question, by the express terms of the act of Congress, were given only 'when not in contravention of state or local law,' the state court was, if not expressly, at least impliedly, authorized by Congress to consider and pass upon the question whether the particular power was or was not in contravention of the state law, and we place our conclusion on that ground." 244 U.S. at 427–428, 37 S.Ct. at 738.

▮ The authority of the Superintendent to bring an action such as that involved in this case was also implicit in our decision in State of Texas ex rel. Falkner v. National Bank of Commerce of San Antonio, 5th Cir. 1961, 290 F.2d 229, cert. denied, 368 U.S. 832, 82 S.Ct. 55, 7 L.Ed.2d 35. Moreover, the Superintendent, as the primary enforcement officer of state banking laws which, under § 36(c), govern national banking associations, is particularly qualified to act as a plaintiff in cases such as this. He is also particularly well situated to represent interests adverse to those of a national bank which, even with the approval of the Comptroller of the Currency,[1] would naturally be inclined to push the restrictions of § 36(c) to, or, if possible, beyond, their proper limits.

Since we find that the district court erred in dismissing the complaint for lack of a proper party plaintiff and the case must be remanded for further proceedings, we do not reach the merits at this stage.

The judgment of the district court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

---

1. Since Congress chose to achieve equalization between state and national banks by binding the latter to the restrictions placed on the former, rather than by imposing uniform federal standards for all banks, the State Superintendent, whose job it is to enforce the state restrictions, would logically be more strongly motivated to see to it that national banks also adhered to these standards than would the Comptroller of Currency. The fact that the Comptroller is charged under 12 U.S.C. § 93 with the duty of enforcing the National Bank Act certainly does not have the effect of prohibiting actions to enforce that law by any other party who might have a legitimate interest. See Suburban Trust Co. v. National Bank of Westfield, D.N.J.1962, 211 F. Supp. 694.