STATE CHARTERED BANKS IN WASH-
INGTON, a corporation, et al.,
Plaintiffs,

v.

PEOPLES NATIONAL BANK OF WASH-
INGTON, a national banking
association, Defendant,

Jack C. Hood, Supervisor of Banking,
State of Washington, Plaintiff-
Intervenor,

James J. Saxon, Comptroller of the Cur-
rency of the United States, Defendant-
Intervenor.

No. 6338.

United States District Court
W. D. Washington, N. D.

Feb. 28, 1966.

As Amended June 1, 1966.

Alfred J. Schweppe, Mary Ellen Krug, Reiter, Doolittle & Krug, Seattle, Wash., for plaintiffs.

MacBride & Sax, Thomas H. MacBride, Ward L. Sax, Kenneth G. Burrows, Seattle, Wash., for defendants.

John J. O'Connell, Atty. Gen. of State of Washington, Herbert Gelman, Asst. Atty. Gen., Tacoma, Wash., for intervenor Hood.

Nicholas Katzenbach, U. S. Atty. Gen., William N. Goodwin, U. S. Atty., Stanley H. Barer, Asst. U. S. Atty., Seattle, Wash., for intervenor Saxon.

LINDBERG, Chief Judge.

The plaintiffs, State Chartered Banks in Washington, a Washington corporation, and its member banks chartered by the State of Washington, filed this action on December 16, 1964 against the defendant, Peoples National Bank of Washington, a national banking association. Plaintiffs seek injunctive relief and a judgment declaring that it would be unlawful for the defendant to receive deposits, cash checks or lend money at a building then under construction in the City of Renton, Washington or at any other place in said city other than the defendant's presently-established branch at 222 Williams Street in Renton, except by taking over or acquiring an existing bank or national banking association or branch bank presently operating in Renton, as provided in RCW 30.04.280 and 30.40.020.

Plaintiffs allege that the action arises under the National Bank Act, 12 U.S.C. § 21 et seq, and particularly under § 36 thereof, and that jurisdiction vests in this court by virtue of 28 U.S.C. §§ 1331 and 2201, the matter in controversy exceeding (exclusive of interest and costs) the sum of $10,000.

On December 21, 1964, Honorable John C. Bowen, a judge of this court, after hearing and making findings and conclusions of law, decided the matter in controversy exceeded the sum of $10,000, the court had jurisdiction, and plaintiffs were entitled to an injunction pendente lite as sought. On the same day a preliminary injunction was entered and a bond by plaintiff association and its surety in the penal sum of $20,000 (required as a condition of the issuance of the injunction) was filed and approved under the direction of the court.

Following the issuance of the temporary injunction Ray D. Carrell, Supervisor of Banking, Division of Banking, Department of General Administration of the State of Washington, and later his successor, Jack Hood, was given leave to intervene and file a complaint as plaintiff-intervenor, pursuant to Rule 24(b) of the Federal Rules of Civil Procedure, and thereafter James J. Saxon, Comptroller of the Currency of the United States, was also granted leave to intervene and file an answer to the complaint in intervention under the same subsection of the rule.

Upon completion of discovery and other pretrial procedures an agreed pretrial order was submitted and plaintiffs, together with plaintiff-intervenor, moved for summary judgment, contending that there was no genuine issue as to any material fact; and that under a correct interpretation of 12 U.S.C.A. § 36(c), considered in the light of the applicable provisions of the state statutes, i. e. RCW 30.40.020 and 30.04.280, the proposed drive-in facility to be operated at 818 Second Avenue in the City of Renton would be an additional branch of the defendant, Peoples National Bank, which could not be lawfully authorized or operated.

While I concluded that the basic issue for decision would become one of statu-

tory interpretation, I deferred ruling on the motions for summary judgment because of the defendant's contentions that plaintiffs lacked standing to sue and further that the court was without jurisdiction because the matter in controversy did not exceed the sum of $10,000. The defendant insisted that there was a genuine issue of material fact, not only with respect to whether the facility was a branch bank, but more particularly on the preliminary issues of jurisdiction and justiciability. I therefore believed they should have an opportunity to present evidence and argue the case on its merits after trial.

The case having been submitted following trial and extensive argument, the basic issue for decision, assuming standing to sue and jurisdiction, is whether the operation of the proposed facility would constitute a branch of a national banking association under the applicable federal statute. The Comptroller of the Currency of the United States, James J. Saxon, upon inquiry by the defendant bank, undertook a limited investigation of the proposal, approved it and thereby made an administrative determination that the facility would not constitute a branch under the federal statute.

A brief outline of the factual situation, largely undisputed, will be helpful in understanding the court's discussion of the issues.

Peoples National Bank is a national banking association chartered by the federal government and operating under the supervision of the Comptroller of the Currency. It is essentially a commercial bank and has its main office at 1414 Fourth Avenue in the heart of the business district of Seattle.

The Renton branch, established as such in 1934, is the oldest of some thirty-five or more operating branches in the State of Washington.

With a present population of approximately 21,000 people, the City of Renton is situated on the south end of Lake Washington with its northwesterly boundary adjoining a part of Seattle's southeasterly city limits. It is in the midst of a rapidly growing industrial development to the south of Seattle, which includes Boeing Aircraft, Pacific Car and Foundry, and many other growing industries.

Renton has many suburban residents who commute to and from work in Seattle. Also, there are many residents of Seattle and other nearby communities commuting between home and various industrial plants in the vicinity of Renton. Increased traffic in recent years has caused serious congestion in the area of Peoples Renton branch which is located at 222 Williams Street. The block of this location is bounded by Williams Street on the front, Wells Street to the rear, and Second and Third Avenues on either side, all being restricted to one-way traffic. An alley sixteen feet in width bisects the block, running from Second to Third Avenue. To accomodate existing customers, avoid loss of business and to develop new patrons, Peoples acquired, in addition to the limited parking space already provided in the immediate vicinity of the branch, a half block of parking area some 260 feet away, located on Second Avenue, one of the most heavily traveled arterials through Renton. To provide a more convenient service a "drive-in, walk-in" facility was proposed for customers whose only bank business was cashing checks or making deposits or installment payments. This facility would be serviced by two or more tellers and a supervisor as business might require, but all operations would be subject to the branch management at Williams Street and persons desiring additional service would be required to go there.

Accordingly, Peoples notified the Comptroller that it planned an "expansion" of their present facility by the addition of a parking lot teller service. The Comptroller advised that he considered this project as "an extension" of the present facilities rather than a branch; therefore no authorization from his office was necessary. He asked to be kept informed so that the Treasury

records would remain current. (Exhibits A–1 and A–2.)

Construction on the project commenced, but as noted above, it was soon interrupted.

### STANDING TO SUE

■■■ I will consider first the defendant's contention that no plaintiff, including the intervenor Hood, has standing to sue. Lack of standing to sue means there exists no justiciable controversy between the person suing and a defendant. For the judicial power to be exercisable there must be a case or controversy. However, if the person bringing the action suffers no direct injury and has no property or no rights that will be directly affected, there is no case or controversy upon which the federal judicial power depends. Constitution, Article III, section 2; see Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); Doremus v. Board of Education etc., 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952).

First, let us look at the plaintiff, State Chartered Banks, together with its members. In determining whether there is any standing for plaintiffs to sue, it will be helpful to apply the standards laid down by Justice Frankfurter in his concurring opinion in Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123 at 151, 71 S.Ct. 624 at 638, 95 L.Ed. 817 (1951), a leading case on the issue of "standing." He there stated:

"Adverse personal interest, even of such an indirect sort as arises from competition, is ordinarily sufficient to meet constitutional standards of justiciability. The courts may therefore by statute be given jurisdiction over claims based on such interests. (Citations.)

" * * * To require a court to intervene in the absence of a statute, however, either on constitutional grounds or in the exercise of inherent equitable powers, something more than adverse personal interest is needed. This additional element is usually defined in terms which assume the answer. It is said that the injury must be 'a wrong which directly results in the violation of a legal right.' Alabama Power Co. v. Ickes, 302 U.S. 464, 479, [58 S.Ct. 300, 303, 82 L.Ed. 374]. Or that the controversy 'must be definite and concrete, touching the legal relations of parties having adverse legal interests.' Aetna Life Ins. Co. v. Haworth, supra, 300 U.S. at 240–241, [57 S.Ct. at page 464]. These terms have meaning only when contained by the facts to which they have been applied. In seeking to determine whether in the case before us the standards they reflect are met, therefore, we must go to the decisions. They show that the existence of 'legal' injury has turned on the answer to one or more of these questions: (a) Will the action challenged at any time substantially affect the 'legal' interests of any person? (b) Does the action challenged affect the petitioner with sufficient 'directness'? (c) Is the action challenged sufficiently 'final' ? "

Applying the test of "legal" injury by posing the suggested questions to our situation, let us inquire first whether the "legal" interests of any person are challenged by the defendant's proposed action. To begin with, What are the broad legal interests here involved? Both state banks and federal banks are chartered institutions, the charter being given by the respective sovereign for the conduct of banking business. Such banks would be entitled, it would seem, to bring an action against any activity threatening the property rights of the charter or flowing from the charter. See Wisconsin Bankers' Association v. Robertson, 190 F.Supp. 90 (DC DC 1960). Furthermore, the state (and federal) banks have the legal right to operate within a competitive scheme that has been statutorily defined. If an act threatens to disrupt the balance of that scheme, those others who are affected have the right to legal redress. See National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537 (6 Cir. 1958). Therefore, if one or more members of State Chartered Banks in-

dividually have the right to sue, upon what grounds can the association, formed for the protection of banking interests, be denied a concurrent right? Cf. Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). I do not think the association can be denied this right.

■ The statutory scheme designed to sustain the lives of both state and federal banks allegedly has been threatened in the State of Washington. Perhaps only a few of the plaintiff banks could be irreparably injured if the defendant is allowed to operate its parking lot teller windows at Renton. Nevertheless, once the pattern is established whereby national banking associations are permitted such drive-in facilities and state banks are not, other state banks throughout the state may be similarly threatened by other national banking associations establishing similar facilities. Their future existence and economic health may soon be in jeopardy by an alleged violation of federal law, a law designed for their protection. These state banks therefore have "legal" interests which will be substantially affected by the challenged action.

Although mere economic injury may not be sufficient to give standing to sue in some cases the federal banking act was designed specifically to protect a particular economic interest. Under that law I believe the plaintiff, State Chartered Banks, and all its member banks have sufficient "legal" interest to justify standing to sue. See First National Bank of Smithfield, N. C. v. Saxon, 352 F.2d 267 (4 Cir. 1965) (advance pamphlet).

■ The next question is whether the action challenged affects plaintiffs with sufficient directness. The association was formed to protect the interests of all its member state banks. Two of the member banks, namely, Seattle Trust & Savings Bank and The Bank of Kent, are near the proposed facility and have presented credible evidence they will suffer economic injury—loss of customers—if the defendant bank is allowed to operate

this facility. They will be directly affected. By membership in State Chartered Banks they have designated the plaintiff association as a protector of their interests. Under this state of facts it seems to me that the action challenged does affect the plaintiff association as well as at least two of the plaintiff banks with sufficient directness.

■ The third query is whether the action challenged is sufficiently "final." The action challenged is the proposal of the defendant, Peoples National Bank, to construct and operate a facility as an "extension" of its present establishment in Renton. The facility is partially built and its completion has been delayed solely because of the pending litigation. The Bank intends to complete and operate this facility unless permanently enjoined from doing so. As far as the action of the Comptroller is concerned, both the defendant and the intervenor defendant contend that nothing more need be done by him. He has given his approval of the facility as an extension of an existing branch and he proposes to take no further action in the matter. Also, the Comptroller infers that his action is conclusive by asking this court to take the case in a review posture. Such circumstances indicate that both the acts of the Comptroller and the defendant bank are sufficiently complete to meet the test of "finality."

From the foregoing discussion it seems clear to me that the standing to sue of the plaintiff, State Chartered Banks in Washington, and at least two of the plaintiff banks, as noted above, cannot be seriously questioned. The remaining plaintiff banks as state banks have such a vital interest in the issue, inasmuch as it may set a precedent that will adversely affect them under similar circumstances in the future, that they also are properly joined as parties plaintiff.

■ Whether Jack Hood, as Supervisor of Banking of the State of Washington, has standing to sue seems academic once the court rules that one or more of the principal plaintiffs in the

case has standing. Nevertheless, it is my view that the argument presented by the Attorney General in support of the Supervisor's right to intervene as a plaintiff is sound. His position is sustained by the reasoning advanced in the decisions in First National Bank in St. Louis v. State of Missouri, etc., 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1924) and Jackson v. First National Bank of Valdosta, 349 F.2d 71 (5 Cir. 1965).

## JURISDICTION

As a second preliminary issue the defendant challenges the jurisdiction of this court to hear and decide this case because of plaintiffs' failure to establish that the matter in controversy exceeds the sum or value of $10,000.

When arguing their motion for summary judgment, the plaintiffs, recognizing that damages to the individual plaintiff banks must be prospective and not easy of evaluation, relied upon the rule stated in Ridder Bros. v. Blethen (9 Cir. 1944) 142 F.2d 395, 399, as follows:

"The value of the 'thing sought to be accomplished by the action' may relate to either or any party to the action."

At the time plaintiffs sought a preliminary injunction in December, 1964, the defendant, by affidavit of Robert G. Perry, Senior Vice President and Cashier of defendant bank, represented that the contract for the construction of the facility (alleged branch) had been let and was in progress; and that the cessation thereof by court order would result in loss to the defendant due to "contract cancellation, return of equipment, and the like, in excess of $50,000." Plaintiffs therefore plausibly contend that under the law of the Ninth Circuit ample showing has been made that the matter in controversy exceeds the sum or value of $10,000. As noted in the introductory paragraphs of this memorandum, the fact that Judge Bowen, after hearing, so found and issued an injunction pendente lite, conditioned upon plaintiffs providing a $20,000 bond, lends additional weight to the plaintiffs' position.

Counsel for defendant question the validity of the rule as stated in the *Ridder* case, supra, asking, "Is this good law?" Be that as it may, the case has never been overruled nor, so far as I have been able to ascertain, has it ever been "distinguished" to the extent that its authority is in doubt.

To overcome the adverse effect of *Ridder* the defendant cites an annotation in 30 A.L.R.2d 602, et seq., entitled, "Criterion of jurisdictional amount to vest jurisdiction of federal court where injunction is sought." Two brief summaries of parts of Sections 6 and 7 of that annotation are quoted:

"Sec. 6. *Value to plaintiff as test.* According to the great weight of authority, the test of the jurisdictional amount in injunction cases is the value to plaintiff of the right sought to be protected. In other words, the determination of the matter in controversy is to be approached from the plaintiff's point of view." (Id. at 621)

"Sec. 7. *Value to defendant as test.* * * * If not representing, in the strict sense, a minority view, it has been applied in a minority of the decisions on the subject." (Id. at 628)

While I have no quarrel with these statements, I must be more concerned with the authority of this circuit. Most, if not all, of the Ninth Circuit cases listed in sections 6 and 7 of the annotations are pre-*Ridder* cases. Their authority is therefore largely dissipated by the later holding in *Ridder,* supra.

Moreover, a recent case from the Fourth Circuit shows that this holding may be gaining acceptance in other jurisdictions as well as our own circuit. In Government Employees' Insurance Company v. Lally, 327 F.2d 568 (4 Cir. 1964) the company sought by declaratory judgment to limit its liability to $10,000, against the other party's assertion that liability was $30,000. The court found that the jurisdictional requirement was met, and stated the amount in controversy as being "the pecuniary result to *either* party which that judgment would

produce." (Id. at 569. Emphasis added.)

Alleging the jurisdictional amount ordinarily settles the question, unless it is challenged. Trial and submission of the evidence left no doubt that it was being challenged in this case. Plaintiffs thus recognize they may have the ultimate burden of clearly proving the requisite amount, and they argue that the record establishes it based upon the test of value to the plaintiffs.

The principal testimony presented by the plaintiffs to establish damage or value of loss to plaintiffs comes from officers of three of the plaintiff banks.

Marvin Gray, cashier of the Bank of Kent, estimated that his bank would lose two-thirds of their Renton customers if the proposed facility were allowed to operate as planned. He estimated the bank's income loss as being approximately $6,300 per year. Assuming his estimate is 100% incorrect, and the actual loss should prove to be only $3,100 per year, this plaintiff alone would lose in excess of $10,000 in a three and one-half year period of time.

Mr. Duncan Tucker, a vice president of the Northwest Bank of Seattle, stated his bank did about $31,000 of business per year with Renton customers. He felt that if Peoples were allowed to operate the proposed facility in its present location the Northwest Bank would lose about $2,000 per year in future business over the next two and one-half to three years.

Mr. J. Frank Campbell, senior vice president of Seattle Trust and Savings, was of the opinion that operation of the proposed facility would cause a "redistribution" of deposits, and his bank would lose "several thousand dollars per year" to the proposed Renton facility.

Cross examination of these witnesses brought out the difficulty of establishing monetary losses that might result from the operation of the proposed drive-in facility. It seems clear, however, that such a facility located on an increasingly well-traveled arterial, in an area that is experiencing unusual industrial growth and development will draw business and new customers to the defendant bank. Some of this business would otherwise continue in substantial amounts with the three state banks just referred to as well as with other plaintiff banks in the Seattle or Tacoma area. Attracting new customers, we must assume, is one of the purposes of the extension, if it may be called such, an objective that is certainly permissible and I would think laudable under our system of free and competitive enterprise. So if there are doubts about jurisdictional amount in a case such as this they should be resolved in favor of the plaintiff.

While in arguing the jurisdictional issue this case has been described as an "injunction suit," it is also basically a declaratory judgment action brought, as alleged in the opening paragraph of the complaint, under 28 U.S.C.A. § 2201, to determine the *defendant's right to operate the proposed drive-in facility* under 12 U.S.C. § 36.

The plaintiffs seek to have the facility declared unlawful. However, had defendant chosen to do so it might have brought a similar declaratory judgment action seeking to have its proposed facility declared lawful under the same statute. In such a case the matter in controversy— *the right to operate the facility*—and the value thereof would be the same, although in that situation I very much doubt whether Peoples National Bank, as plaintiff, would concede that its right was valued at less than $10,000. Should not the same yardstick be applied here when instead the plaintiffs seek to have the establishment of the facility declared unlawful? A few cases will demonstrate that it should.

In the case of Hunt v. New York Cotton Exchange, 205 U.S. 322, 27 S.Ct. 529, 51 L.Ed. 821 (1907) the New York Cotton Exchange brought a suit to enjoin Hunt, a Tennessee stockbroker, from receiving and using the quotations of sales made upon the Exchange. The case was before the Supreme Court on the issue of jurisdiction only, the appellant Hunt contending that the jurisdictional amount

was lacking in that only the amount paid the telegraph company was involved. The court held that the right to control the quotations of the Exchange was the matter in dispute and its value to the Exchange determined the jurisdiction. The court stated:

"In other words, the object of the suit is to keep the control of the quotations by the Exchange and its protection from the competition of bucket shops or the identity of its business with that of bucket shops. And the right to the quotations was declared, as we said in Board of Trade [of City of Chicago] v. Christie Grain & Stock Company, [198 U.S. 236, 25 S.Ct. 637, 49 L.Ed. 1031], to be property, and the Exchange may keep them to itself or communicate them to others. The object of this suit is to protect that right. *The right, therefore, is the matter in dispute, and its value to the Exchange determines the jurisdiction,* not the rate paid by appellant to the Telegraph Company. The value of the right was testified to be much greater than $2,-000. In Mississippi & Missouri Railroad Company v. Ward, 2 Black, 485, [17 L.Ed. 311,] it was decided that jurisdiction is tested by the value of the object to be gained by the bill. To the same effect is Board of Trade v. Cella Commission Company, 145 Fed. Rep. 28. In the latter suit the Chicago Board of Trade obtained a decree restraining the use of its continuous quotations by the Cella Commission Company. It was said that the amount or value of such right is not the sum a complainant might recover in an action at law for the damage already sustained, nor is he required to wait until it reaches the jurisdictional amount. The latter declaration is supported by Scott v. Donnell, 165 U.S. 107, [17 S. Ct. 262, 41 L.Ed. 648]." (Emphasis added.)

The Court of Appeals for the Ninth Circuit in the case of In re Sawyer, 256 F.2d 553 (1956), cited and relied on the reasoning of the Supreme Court in the *Exchange* case in holding that the value of the matter in controversy depended upon the value of the right involved. See also Davis v. American Foundry Equipment Company, 94 F.2d 441, 115 A.L.R. 1486 (7 Cir. 1938) and Annotations 115 A.L.R. 1489.

This case as a declaratory judgment action seems to fit the category of cases where the requisite jurisdictional amount should be determined by the value of the right involved not only with respect to one or more of the plaintiffs but also as to the defendant. The evidence of possible or probable damage to the three plaintiff banks, as noted earlier in this opinion, is helpful in determining the value to the defendant of the right to operate the facility, should such right exist. Such evidence alone, and most certainly when buttressed by the contention of defendant as to losses that will result in the event a permanent injunction issues, suffices for the court to find that the value of the defendant's right to operate the proposed facility is substantially in excess of $10,000.

While there may be some doubt whether the evidence clearly establishes the requisite amount by the "value-to-the-plaintiff" test, there is no doubt if we apply the "value-of-the-thing-to-be-accomplished-by-the-action" test. The latter test may relate to either party in the action; and in the court's opinion the jurisdictional amount of $10,000 is clearly established by the record evidence, using that test. Both the *Ridder* and *Sawyer* cases, supra, approve the latter rule.

## LEGALITY OF THE PROPOSED DRIVE-IN FACILITY

We now come to the actual issue in dispute, although it may appear, as is sometimes the case in federal court suits, that the threshold issues of standing to sue and jurisdiction have presented the major problems for solution.

The issue on the merits is whether the proposed drive-in facility is an illegal branch of a national bank under

the provisions of 12 U.S.C. § 36.[1] The conditions upon which a national banking association may establish and operate a branch, as set forth in section 36, in ef-

1. § 36. *Branch banks*

The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

(a) A national banking association may retain and operate such branch or branches as it may have had in lawful operation on February 25, 1927, and any national banking association which continuously maintained and operated not more than one branch for a period of more than twenty-five years immediately preceding February 25, 1927, may continue to maintain and operate such branch.

(b) (1) A national bank resulting from the conversion of a State bank may retain and operate as a branch any office which was a branch of the State bank immediately prior to conversion of such office—

(A) might be established under subsection (c) of this section as a new branch of the resulting national bank, and is approved by the Comptroller of the Currency for continued operation as a branch of the resulting national bank;

(B) was a branch of any bank on February 25, 1927; or

(C) is approved by the Comptroller of the Currency for continued operation as a branch of the resulting national bank.

The Comptroller of the Currency may not grant approval under clause (C) of this paragraph if a State bank (in a situation identical to that of the national bank) resulting from the conversion of a national bank would be prohibited by the law of such State from retaining and operating as a branch an ident'cally situated office which was a branch of the national bank immediately prior to conversion.

(2) A national bank (referred to in this paragraph as the "resulting bank"), resulting from the consolidation of a national bank (referred to in this paragraph as the "national bank") under whose charter the consolidation is effected with another bank or banks, may retain and operate as a branch any office which, immediately prior to such consolidation, was in operation as—

(A) a main office or branch office of any bank (other than the national bank) participating in the consolidation if, under subsection (c) of this section, it might be established as a new branch of the resulting bank, and if the Comptroller of the Currency approves of its continued operation after the consolidation;

(B) a branch of any bank participating in the consolidation, and which, on February 25, 1927, was in operation as a branch of any bank; or

(C) a branch of the national bank and which, on February 25, 1927, was not in operation as a branch of any bank, if the Comptroller of the Currency approves of its continued operation after the consolidation.

The Comptroller of the Currency may not grant approval under clause (C) of this paragraph if a State bank (in a situation identical to that of the resulting national bank) resulting from the consolidation into a State bank of another bank or banks would be prohibited by the law of such State from retaining and operating as a branch an identically situated office which was a branch of the State bank immediately prior to consolidation.

(3) As used in this subsection, the term "consolidation" includes a merger.

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. In any State in which State banks are permitted by statute law to maintain branches within county or greater limits, if no bank is located and doing business in the place where the proposed agency is to be located, any national banking association situated in such State may, with the approval of the Comptroller of the Currency, establish and operate, without regard to the capital requirements of this section, a seasonal agency in any resort community within the limits of the county in which the main office of such association is located, for the purpose of receiving and paying out deposits, issuing and cashing checks and drafts, and doing business incident thereto: *Provided,* That any permit issued under this sentence shall be revoked upon the opening of a State or national bank in such com-

fect incorporate state laws. These state laws relate to the establishment and operation of branches as authorized to state banks. Therefore, in construing federal law, the court must also construe the pertinent banking laws of the State of Washington.

At the outset it should be stated that this is but another one of what has now become a series of suits wherein the authority of the Comptroller has been challenged regarding the establishment of branches or off-premise facilities by national banks.[2]

The history and design of our dual banking system regarding branch banking, since the McFadden Act, 44 Stat. 1224, in 1927 authorized national banks to establish branches, has been reviewed at length in several of the cited cases and needs no repetition here.[2]

■ Many decisions have surveyed the limits to which national banks are authorized to branch. In the most recent appellate court decision coming to my attention—Walker Bank & Trust Company v. Saxon, 352 F.2d 90—the Court of Appeals for the Tenth Circuit, after reviewing the history of branch banking, particularly under section 36(c), states at page 94:

"From it all, we are led to the inescapable conclusion that the purpose of allowing national banks to branch

munity. Except as provided in the immediately preceding sentence, no such association shall establish a branch outside of the city, town, or village in which it is situated unless it has a combined capital stock and surplus equal to the combined amount of capital stock and surplus, if any, required by the law of the State in which such association is situated for the establishment of such branches by State banks, or, if the law of such State requires only a minimum capital stock for the establishment of such branches by State banks, unless such association has not less than an equal amount of capital stock. As amended July 15, 1952, c. 753, § 2(b), 66 Stat. 633; Sept. 28, 1962, Pub.L. 87–721, 76 Stat. 667.

was to enable them to fairly compete with state banks. In enabling them to do this, Congress said in the McFadden Act that State law will in each instance determine whether to permit a national bank to branch. This policy was again carried over in the Banking Act of 1933 through the Bratton Amendment despite the fact that originally the Glass bill sought to change that policy. It seems to us a frustration of that policy to say as the trial court did that merely because a state in a broad general way sanctions branch banking, that is enough to permit a national branch, even though other vital provisions of state branching laws are not met. In other words, we believe the proper approach is for the Comptroller to look at all the State law on branch banking not just part of it. While we entertain no doubt of Congress' authority to regulate national banks in whatever way it deems fit, we are convinced that in this area of the law, Congress has restricted its power and acceded to state law which it may certainly do. It is clear to us that the Congress intended to create and maintain a competitive equality between state and national banks."

This expression of the court aptly summarizes the conclusion reached by every appellate court and, with few exceptions, the views of the trial courts that have ruled on the question in recent years.

2. First National Bank in St. Louis v. State of Missouri, etc., 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1924);
Jackson v. First National Bank of Valdosta, 349 F.2d 71 (5 Cir. 1965);
Walker Bank & Trust Company v. Saxon, 352 F.2d 90 (10 Cir. 1965);
National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537 (6 Cir. 1958), cert. denied, 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69;
Commercial Security Bank v. Saxon, 236 F.Supp. 457 (DC D.C.) (1964);
Commercial State Bank of Roseville v. Gidney, 174 F.Supp. 770 (DC D.C.1959), aff'd per curiam 108 U.S.App.D.C. 37, 278 F.2d 871.

Granting that the Comptroller has full authority over national banks and that 12 U.S.C. § 36 is the applicable and controlling federal law to be followed in ascertaining the legality of the proposed drive-in facility, the question for decision ultimately becomes whether such a facility is expressly authorized to state banks by the statute law of the State of Washington as required under subsection (c) of section 36. As stated by the Court of Appeals in Jackson v. First National Bank of Valdosta, 349 F.2d 71 (5 Cir. 1965) at page 73:

"If such facilities are not authorized to Georgia banks under Georgia law, then, by virtue of § 36(c), they are not authorized to national banks by the National Bank Act."

The state law pertaining to branches is found in RCWA 30.04.010, 30.04.280, 30.40.020 (third paragraph), 32.04.020 and 32.04.030(3).[3]

3. 30.04.010 *Definitions.* Certain terms used in this title shall have the meanings ascribed in this section.

"Banking" shall include the soliciting, receiving or accepting of money or its equivalent on deposit as a regular business.

"Bank," unless a different meaning appears from the context, means any corporation organized under the laws of this state engaged in banking, other than a trust company or a mutual savings bank.

"Branch bank" means any office of deposit or discount maintained by any bank or trust company, domestic or otherwise, other than its principal place of business, regardless of whether it be in the same city or locality.

The term "trust business" shall include the business of doing any or all of the things specified in RCW 30.08.150(2), (3), (4), (5), (6), (7), (8), (9), (10) and (11).

"Trust company," unless a different meaning appears from the context, means any corporation organized under the laws of this state engaged in trust business.

A "savings account" is an account of a bank in respect of which, (1) a passbook, certificate or other receipt may be required by the bank to be presented whenever a deposit or withdrawal is made and (2) the depositor at any time may be required by the bank to give notice of an intended withdrawal before the withdrawal is made.

"Savings bank" shall include (1) any bank whose deposits shall be limited exclusively to savings accounts, and (2) the department of any bank or trust company that accepts, or offers to accept, deposits for savings accounts in accordance with the provisions of this title.

"Commercial bank" shall include any bank other than one exclusively engaged in accepting deposits for savings accounts.

"Person" unless a different meaning appears from the context, shall include a firm, association, partnership or corporation, or the plural thereof, whether resident, nonresident, citizen or not.

"Supervisor" means the state supervisor of banking.

"Foreign bank" and "foreign banker" shall include:

(1) Every corporation not organized under the laws of the territory or state of Washington doing a banking business, except a national bank;

(2) Every unincorporated company, partnership or association of two or more individuals organized under the laws of another state or country, doing a banking business;

(3) Every other unincorporated company, partnership or association of two or more individuals, doing a banking business, if the members thereof owning a majority interest therein or entitled to more than one-half of the net assets thereof are not residents of this state;

(4) Every nonresident of this state doing a banking business in his own name and right only.

30.04.280 *Compliance enjoined—Banking, trust business, branches.* No person shall engage in banking except in compliance with and subject to the provisions of this title, except it be a national bank or except insofar as it may be authorized so to do by the laws of this state relating to mutual savings banks, nor shall any corporation engage in a trust business except in compliance with and subject to the provisions of this title, nor shall any bank engage in a trust business except as herein authorized, nor shall any bank or trust company establish any branch except in accordance with the provisions of this title. The practice of collecting or receiving deposits or cashing checks at any place or places other than the place where the usual business of a bank or trust company and its operations of discount and deposit are carried on shall be held and construed to be establishing a branch.

Before proceeding further with an analysis of either the state or federal statutes it is necessary to first set forth and consider the position taken by the Comptroller (defendant-intervenor) as to the proposed drive-in facility. By letter dated May 18, 1964 and signed by J. T. Watson, Deputy Comptroller of the Currency, the United States Treasury Department approved the proposal as an extension of the branch premises in the following language:

"This is to advise you that your proposal to construct drive-up, walk-up windows on property adjacent to your Renton Branch (Certificate No. 1387A), located at 222 Williams Street, Renton, King County, Washington, has been approved as an extension of the branch premises.

"Our decision to view this contemplated addition as an extension of the branch premises took into consideration the following factors:

"The drive-up, walk-up windows will be located on property 260 feet from the branch office and the two locations will constitute but one location in the public mind. The proposal will enable the bank to better serve its customers and will be in unity of operation with the Renton Branch.

"Certification by this Office is neither issued nor required. It will be appreciated, however, if you will advise us when the facility is officially opened in order that our files may be complete." (Exhibit A–2.)

Having been so advised, the defendant concurred, perhaps because it had little choice. It now contends, as does the defendant-intervenor, that the determination of the Comptroller that the proposed facility was not a branch (but rather an extension of an existing branch) was a decision within his lawful authority and *discretion*. Consistent with this contention, defendant and defendant-intervenor argue that the proposed facility is not a branch, and hence those state statutes which relate to branches are not applicable.

Implied in this argument is the theory that the Comptroller's categorization of the building should control unless it is arbitrary and capricious; and the Comptroller having decided it to be an "extension" (not a branch) the branching statute should not apply.

In deciding that the facility was an "extension," the Comptroller applied bas-

---

30.40.020 *Branches authorized—Restrictions.* * * *

No bank or trust company shall establish or operate any branch in any city or town outside the city or town in which its principal place of business is located in which any bank, trust company or national banking association regularly transacts a banking or trust business, except by taking over or acquiring an existing bank, trust company or national banking association or the branch of any bank, trust company or national banking association operating in such city or town.

32.04.020 *Definitions.* The use of the term "savings bank" in this title refers to mutual savings banks only.

The use of the words "mutual savings" as part of a name under wh'ch business of any kind is or may be transacted by any person, firm, or corporation, except such as were organized and in actual operation on June 9, 1915, or as may be thereafter organized and operated under the requirements of this title is hereby prohibited.

The use of the term "supervisor" in this title refers to the supervisor of banking. 32.04.030 *Offices—Branches.* * * *

(3) A savings bank, with the approval of the supervisor, may establish and operate branches but only upon the conditions and subject to the limitations following:

(a) If its guaranty fund is not less than the aggregate paid-in capital which would be required by law as a prerequisite to the establishment and operation of an equal number of branches in like locations by a bank.

(b) Branches may be established in any county of the state; and

(c) A branch shall not be established at a place at which the supervisor would not permit a proposed new savings bank to engage in business, by reason of any consideration contemplated by RCW 32.-08.040, 32.08.050 and 32.08.060, the provisions of which, insofar as applicable, including those relating to appeals, shall extend to applications to establish branches.

ically two tests: the unity of operation test, and the "aspect of oneness" (as seen by the public) test. Under unity of operation, if the branch and the drive-in facility are internally operated as a unit, this is an indication that the facility is an "extension" rather than a branch. Secondly, if the public comes to think of the two buildings as "one," then this is another sign that the facility is an "extension."

The Court in Jackson v. First National Bank of Valdosta, 246 F.Supp. 134 (D. Ga.1965), under a factual situation similar to ours, flatly rejected the identical "extension" argument. After considering the argument that there would be a "unity of operation" and the public would have greater banking convenience, and they would think of the new facility as *one* with the main office (the same arguments as were made in this case) Judge Bootle said at page 139:

> "This court feels that the concept 'unity of operation' is too pliable and amorphous to be accepted here in support of the position that the disputed 'branch' apparently covered under § 36 (f) is really not a 'branch' but is in effect an 'expansion of an existing facility,' * * * "

While I am inclined to agree with Judge Bootle's conclusion, I think the contention needs further consideration.

The government, as intervenor, argues that this controversy should be looked at from a position of review; that the Comptroller, being vested with the task of supervising national banking, has the authority and duty of initially interpreting the statute; and that once his interpretation is made, it should not be disturbed unless it is arbitrary and capricious. Since the Comptroller authorized the facility as an extension he must have concluded it was not a branch. In concluding it is not a branch the Comptroller is in effect construing the statute. It is this construction which we are asked to uphold unless it is arbitrary and capricious.

The plaintiffs oppose this argument by saying, first, that the entire question is one of statutory interpretation, and statutory interpretation is a question for the courts, not an administrator. Second, there is no action to review, since the Deputy Comptroller, in his letter, stated "no certificate is necessary."

It seems to me that the government's argument cloaks the question and the plaintiffs' argument begs it. It is clear beyond argument that the Comptroller has an interest in the erection of new buildings or substantial construction work done by a national bank. With him lies the duty of seeing that the bank's capital requirements remain cushioned by some margin of safety. When a request to proceed with construction comes before him he must first decide, (1) whether the bank's capital structure will allow it, and (2) whether the construction will violate any other laws—state or federal. When the Comptroller decided that this facility was "an extension" rather than "a branch" he was making a finding of fact based upon evidence submitted by the defendant bank (ex parte evidence, however). His determination can be upset only by finding that either his action was (1) arbitrary, capricious, or an abuse of discretion, or (2) contrary to constitutional right, power, privilege, or (3) in excess of statutory jurisdiction, authority, or limitation, or (4) without observance of procedure required by law, or (5) unsupported by substantial evidence, or (6) unwarranted by the facts to the extent the facts are subject to trial de novo by the reviewing court. See 5 U. S.C. § 1009(e).

Although plaintiffs have argued strongly that this is not a review case the authority they cite indicates that the administrator's factual determination should be examined in the posture of a review, even though his action might not be an "agency action" within the meaning of the Administrative Procedures Act. Commercial State Bank of Roseville v. Gidney, 174 F.Supp. 770, affirmed per curiam 108 U.S.App.D.C. 37, 278 F.2d 871 (1960); Commercial Security Bank v. Saxon, 236 F.Supp. 457

(DC D.C.1964); Community National Bank of Pontiac v. Saxon, 310 F.2d 224 (6 Cir. 1962); Continental Bank v. National City Bank, 245 F.Supp. 684 (N.D. Ohio, 1965).

 It seems clear in any event that the standards of review listed in the Administrative Procedures Act are the reference point from which we measure the actions of the Comptroller. I agree with the plaintiffs that the Comptroller's action is not the usual case coming before the courts for review of administrative discretion, nor do I understand the defendant to argue that it is. The defendant does contend, however, that the Comptroller has discretion in choosing which factors he will look at to determine if the new construction results in the creation of two branches or merely the expansion of a single branch. By permitting an administrator to choose what factors will govern his fact-finding determinations he can conceivably choose any set of factors which will give him the result he seeks. I can find no expression of Congress which would support any theory of this kind and the only cases cited in support are Michigan National Bank v. Saxon, Civil No. 82162 D.C., July 23, 1962 (unpublished opinion by Judge Holtzoff) and Jackson v. First National Bank of Valdosta, 5 Cir., 349 F.2d 71.

Examination of these cases shows they lend no support to the defendant's "discretion" contention. In *Michigan National Bank* the bank had erected a drive-in facility 500 feet away from the principal office and connected by pneumatic tubes. The Comptroller ruled that this facility was a branch and the bank sought to gain a contrary holding by bringing a declaratory judgment action. Judge Holtzoff ruled that the structure was not a branch "within the meaning and terms of Section 5155 of the Revised Statutes (12 U.S.C. 36 (f)) * * *" Directing himself specifically to the question of discretion, the learned judge, in an oral opinion from the bench, stated:

"So, too, the Court overrules the contention that this matter is not subject to judicial review in that it is committed to agency discretion. A finding of fact, which is what is involved in this case, is not to be confused with discretion or discretionary action. A finding of fact is based on evidence."

This statement hardly supports the defendant's contention.

The scope of the term "branch" is set forth in section 36(f). That section states the term "branch" shall be "held to include any branch bank, branch office * * * additional office * * * at which deposits are received or checks paid, or money lent." Some writers have considered this section as defining the word "branch." Judge Holtzoff referred to this subsection as a definition and so did Judge Bootle. It is with much respect and deference that I venture to disagree with their characterization. I feel that the section should not be given the prestige of a definition if it does not meet the standards of a definition. Congress has nearly two hundred years of experience in enacting statutory definitions. If that body had wished to formulate a true definition I do not believe that the term defined would have appeared as both the subject and the predicate of the definition. Further, the opening paragraph of section 36 clearly indicates that the section was not intended to provide any definitions as such. It states:

"The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:"

Subsection (c) of section 36 may be a partial definition or a description of what *may be* included within the term "branch." It was not intended to be exhaustive. It provides only a broad, functional measuring gauge of what a branch may be. As I read it, the words "additional office * * * at which deposits are received, or checks paid, or money lent," provide only a partial, functional definition for determin-

ing *prima facie* if the supplementing state branching law should come into play. This is what I feel is the import of the Court of Appeals' decision in Jackson v. First National Bank of Valdosta, 349 F.2d 71.

In the *Valdosta* case the state superintendent of banking, by issuing regulations, chose to expand somewhat this partial definition of "branch." The regulations provided that if the drive-in teller facilities were within the boundaries of a single contiguous area, or were across the street but connected by tunnel or overhead passage, it would not be considered as a branch; it would instead be considered as an expansion of the existing facility. Therefore, when looking at a new national bank facility in Georgia the Comptroller is *required* (by the *Georgia* law) to consider contiguity and physical connection; these may determine the character of the facility. This decision makes it fairly clear that once the facility passes the broad functional test set forth in section 36(f) the state law takes over and may further define "branch" in such a way as to comport with the state's banking policy. This was precisely the purpose Congress had in mind when it passed the McFadden Act. See Walker Bank & Trust Company v. Saxon, supra. The *Walker* case also emphasized the role of state law in branching by saying "We believe the proper approach is for the Comptroller to look at all the State law on branch banking not just part of it." Id., 352 F.2d p. 94. But see First National Bank of Smithfield, N. C. v. Saxon, 352 F.2d 267, 271 (4 Cir. 1965).

█ The test of "branchness" in this situation is therefore twofold—(1) Does the facility fit the broad functional definition laid down by Congress in section 36(f), and if so, (2) Does the state law add any more refinements to the definition?

Although defendant argues that Peoples Bank fails to meet the requirements of section 36(f), it admits (or rather does not contest) the fact that the pro-posed facility will receive deposits and pay checks. However, the defendant asserts that "only a part"—25%—of the check-cashing process will be carried out at the proposed facility. They claim that the physical acceptance of the check and payment of the money to the payee constitute only about 25% of the operations connected with check cashing. The remaining operations, such as entry on the books and transmittal of the instrument to the drawee bank, make up the other 75% of the check-cashing process. That may well be. However, the check is nevertheless cashed within the meaning of section 36(f) when the instrument is accepted from and the money paid to the holder. The remaining operations are done so that the transaction is reflected on the books of the bank and to insure that the cashing bank is repaid by the drawee bank.

When the bank accepts the instrument and pays the holder the check is "cashed,"—*all* cashed, not 25%, or 50%, but 100% cashed. True, the remaining operations are part of the *check-cashing process*, but the act of check-cashing is complete after receipt of the check and payment of the money; and it is the *act* of check-cashing that is contemplated by section 36(f). The reason for making this distinction is because the defendant in argument attempted to equate the act of check-cashing with the process of check-cashing. They are not identical. This effort at blurring the differences was apparently done for the purpose of showing "oneness" between the new facility and the principal office at 222 Williams Street. However, "branchness" is a combination of function and physicality—not bookkeeping. See Jackson v. First National Bank of Valdosta, 246 F.Supp. 134 (D.Ga.1965). And any effort to inject the "unity of operation" test into this case is merely another attempt to avoid confrontation with state law. This test was rejected by the district court in *Bank of Valdosta* and under banking laws more liberal than those in the State of Washington.

Having discussed functional characteristics under the federal statute, we now turn to the physical aspect. *Prima facie*, can the proposed facility be properly termed an "additional office?" If it can, we have passed over the threshold of federal law and must then turn to state law for a full consideration of this facility's character. This proposed facility is some 260 feet or more from the principal office, on a separate lot, in another block, across a busy thoroughfare, has a different address, and is in a completely disconnected building. No stretching of the term "additional office" is required at all to see it fits perfectly. The proposed facility is therefore a "branch" within the meaning of the federal statute (12 U.S.C. § 36(f)).

From this point forward, the state statutes and their interpretation as applied to state banks and their branches become the controlling law in determining whether this facility is to be considered a branch or not. This has been plainly stated as noted earlier in this opinion in Jackson v. First National Bank of Valdosta, 349 F.2d 71, and Walker Bank & Trust Company v. Saxon, supra. The rest of the inquiry is therefore confined to ascertaining what category this facility falls into if it were being constructed solely under the dominion of state law.[3]

Unfortunately, there is no state court interpretation of these statutes, which, of course, if one existed, would provide binding guidance upon this court. Nor do we have issued under the statute any regulations, as was the case in *Valdosta,* and it has not been shown that the State Supervisor of Banking has the authority to issue regulations, at least to the extent of supplementing the statutory definition of a "branch."

I must therefore fall back upon the words of the statute and apply the general rules of statutory interpretation that the courts of Washington use. By this method we should arrive at the same interpretation of the state statute as the state court would if it had the case.

Sections 30.04.010 and 30.04.280 RCW define the word "branch." Section 30.-04.010 states:

" 'Branch Bank' means any office of deposit or discount maintained by any bank or trust company, domestic or otherwise, other than its principal place of business, *regardless of whether it be in the same city or locality.*" (Emphasis added.)

Section 30.04.280, in pertinent part, reads:

"The practice of collecting or receiving deposits or cashing checks at any place or places other than the place where the usual business of a bank or trust company and its operations of discount and deposit are carried on shall be held and construed to be establishing a branch."

Also, section 30.40.020 places a restriction on branches by forbidding the establishment of branches except by taking over an existing branch. The defendant has not contended that it is taking over an existing branch.

The recited state statutes are then the law applicable to the case. Reviewing the material facts and circumstances to which these laws must be applied, they are as follows: Heretofore and at present all of the defendant's Renton banking business was carried on at 222 Williams Street, which is a duly authorized branch. If the new facility were allowed to operate the operations of discount and deposit would still take place at 222 Williams, as the defendant freely admits. The new facility is located some 260 feet from the Williams Street building, between Williams and Wells Streets and on the north side of Second Avenue. Second Avenue is a heavily-trafficked thoroughfare; it separates the block where the Williams Street building is from the block where the new facility is. The Williams Street building and the new facility are thus located on separate blocks and the separating street is a well-traveled one-way arterial. The new facility itself faces Second Avenue between Williams and Wells Streets.

The area surrounding the facility is to be used as an additional parking lot for the branch. (Plaintiffs' Exhibit 1.) Initially, two teller's windows and a drive-in gate will be provided so as to serve two drive-in customers simultaneously. Walk-in customers also will be served. The cost of the building, including architectural fees and fixtures, was approximately $50,000. Taking the building purely as a structure, it has a completely separate identity from the block as well as from the building at 222 Williams Street, which is readily apparent when one sees it. If allowed to operate, the new facility will take in deposits and monthly installment payments and cash checks.

There being no Washington decisions on the issue, it is necessary for this court to interpret the statutes as I believe the Supreme Court of Washington would. The only available guide provided by state authority is an opinion of the Attorney General of the State of Washington under date of September 2, 1960 given to Mr. Joseph C. McMurray, Supervisor, Division of Banking. The opinion during trial was referred to as an informal opinion. However, the opinion, after setting forth the pertinent provisions of RCW 30.04.010 and 30.04.280, stated:

> "It is our opinion that any facility for receiving deposits, cashing checks, or accepting payments, physically separated from the main office of a bank constitute a branch bank and must be authorized as a branch."

Defendant does point to certain existing drive-in facilities presumably operating in connection with several other branch national banks in the state. (Exhibit A–5). The fact that somewhat similar facilities may be operating in connection with other branches of state or national banks may well prove the need and indeed the wisdom of authorizing such operations as extensions of an existing branch. The presence of these branches does not assist here, however, in defining what the state law authorizes under existing state statutes. Furthermore, the court must decide the issue on the physical facts and circumstances as established by the evidence with respect to the proposed drive-in, walk-in facility here in question.

The question then is: Is this facility a branch according to state law? Washington courts follow the accepted rule that words in common usage are to be given their plain and ordinary signification; and if the language used is unambiguous a departure from the plain meaning is not justified by policy considerations. Kelso v. City of Tacoma, 63 Wash.2d 913, 390 P.2d 2 (1964); Pacific Northwest Alloys, Inc. v. State, 49 Wash.2d 702, 306 P.2d 197 (1957); State v. Robinson, 67 Wash. 425, 121 P. 848 (1912).

Looking at the statutes in question, their meaning appears to be quite clear— if a distinct facility is used to collect deposits or cash checks, it is a branch *regardless of whether it is in the same locality.* The principal place of business is at 222 Williams Street; this new facility—which would cash checks and accept deposits—is at another place at a different address, on a different block, and in a different building. Giving the state statutes a plain and ordinary interpretation only one conclusion is available regarding this facility.

It is a branch.

It is a branch and it would seem that the Comptroller would have found it to be a branch if he had measured this proposal by the state law of Washington. But he did not. He ignored it, as the Deputy Comptroller stated in his testimony on the stand. In deciding upon the character of this structure the Comptroller did not even consider state law. His apparently deliberate non-observance of the state law was arbitrary, not in accordance with the law, not in accordance with the procedure required by the law, and unwarranted by the facts. See Jackson v. First National Bank of Valdosta, 349 F.2d 71.

The demand and need for drive-in facilities by the public as well as the

state and national banking business, as indicated by certain evidence admitted (such as Exhibits A–6 and A–11) and other evidence offered but excluded, apparently has motivated an administrative usurpation of the judicial function of statutory construction. Perhaps emerging urban patterns have developed a need for new banking techniques; perhaps the branching laws should be liberalized to meet these needs. But these are questions of policy, and under our system of government policy questions are the domain of the legislature. A demand for liberality does not justify the courts in usurping the legislative function. The Comptroller as well as the banking business must persuade the Congress or state legislature of the wisdom of authorizing such facilities where not now permitted by the state.

## IS A BRANCH AUTHORIZED BY ANY STATE LAW?

As a last resort defendant offers a somewhat ingenious argument but one that I find untenable. It argues that even if this new facility is construed to be a branch, it is authorized by state law; and the particular state law which gives the authorization is allegedly RCW 32.04.030. In pertinent part this section reads:

"(1) A savings bank shall not do business or be located in the same room with, or in a room connecting with, any other bank, or a trust company that receives deposits of money or commercial paper, or a national banking association.

\* \* \* \* \* \*

"(3) A savings bank, with the approval of the supervisor, may establish and operate branches *but only upon the conditions and subject to the limitations following*:

"(a) If its guaranty fund is not less than the aggregate paid in capital which would be required by law as a prerequisite to the establishment and operation of an equal number of branches in like locations by a bank.

"(b) Branches may be established in any county of the state; and

"(c) A branch shall not be established at a place at which the supervisor would not permit a proposed new savings bank to engage in business, by reason of any consideration contemplated by RCW 32.08.040, 32.08.050, and 32.08.060, the provisions of which, insofar as applicable, including those relating to appeals, shall extend to applications to establish branches." (Emphasis added)

In its brief the defendant quoted only subsection (3) (b) of RCW 32.04.030. However, the remainder of the section is also material, as will be shown.

The defendant arrives at its conclusion that state statutes do authorize a branch in Renton by the following chain of argument:

1. "Branch" is defined by federal law —federal law that defendant contends does *not* include state law within it;

2. Federal law (12 U.S.C. § 36(c) (1)) permits the Comptroller to authorize branches if establishment and operation are "expressly authorized to state banks by the law of the State in question \* \* \*"

3. Section 36(h) says that "State bank" shall be held to include trust companies, savings banks, "or other such corporations or institutions carrying on the banking business under the authority of State laws."

4. Branches are authorized to state banks under RCW 32.04.030;

5. The defendant carries on "the banking business" and therefore is equivalent to a "State bank" within the meaning of section 36(h).

6. The defendant is therefore permitted, after approval by the Comptroller, to have branches in Renton.

 This argument has the surface of continuity about it, but when taken by the joints its easily falls apart. For instance, the federal statute (section 36 (c)) reads that branching will be allowed only if *expressly* authorized by the state

law. That means that if the defendant wishes to bring itself under RCW 32.04.-030 it must satisfy *all* the provisions of that statute. And subsection (1) forbids a mutual savings bank to be connected with a bank that receives commercial paper. The defendant receives commercial paper *and* it is a national banking association, which is also a forbidden connection. Furthermore, the defendant made no showing that it had the requisite guaranty fund nor that it engaged itself exclusively as a mutual savings bank. Failing in these particulars, it is ineligible to claim the sanctuary of RCW 32.-04.030(3). Its authority to branch must stand or fall under the provisions of RCW 30.04.280, and under a plain reading of that statute, as I have indicated, this building can only be a branch, an unauthorized branch.

This disposes of the defendant's arguments of the case. Since it is clear that the proposed facility, if allowed to operate, would be in violation of state law which has been incorporated into federal law, the preliminary injunction was properly issued and should be made permanent.

Findings of fact, conclusions of law, and decree in accordance with the foregoing opinion may be submitted, upon notice.