Fred O. DICKINSON, Jr., Comptroller of the State of Florida, et al., Appellants,

v.

The FIRST NATIONAL BANK IN PLANT CITY, Plant City, FLOR-IDA, et al., Appellees.

No. 25173.

United States Court of Appeals Fifth Circuit.

Sept. 12, 1968.

V. Carroll Webb, Gen. Counsel, Tallahassee, Fla., William Reece Smith, Jr., Tampa, Fla., for appellants.

John C. Eldridge, Robert E. Kopp, Attys., Dept. of Justice, Washington D. C., Robert S. Edwards, Plant City, Fla., Clinton Ashmore, U. S. Atty., Tallahassee, Fla., for appellees.

Arthur K. Bolton, Atty. Gen., Atlanta, Ga., Horace R. Hansen, St. Paul, Minn., Edgar H. Sims, Jr., Gainesville, Ga., amici curiae.

Before TUTTLE and GOLDBERG, Circuit Judges, and HOOPER, District Judge.

GOLDBERG, Circuit Judge:

This case involves a meshing process in our federalism as we observe two sovereigns competing for their legitimate spheres. The Comptroller of the State of Florida, supported by intervening state banks, contends that First National's shopping center receptacle and armored car messenger service constitute "branch banking" in violation of Section 659.06(1) (a) of the Florida Statutes, F.S.A.,[1] and that the authority

---

1. 659.06 Place of transacting business; school savings; drive-in facilities

(1) (a) Any bank or trust company shall have only one place of doing business, which shall be located in the community specified in its original articles of incorporation, and the business of the bank or trust company shall be transacted at its banking house so located in said community specified, and not elsewhere. A bank or trust company may, however, change the location of its banking house within the community shown in its articles of incorporation with the written approval of the commissioner. Application for such approval shall be in such form and contain such information as the Commissioner may require.

\* \* \* \* \*

for engaging in such activities is therefore denied by the specific terms of Section 36(c) (1) of the National Banking Act, 12 U.S.C. § 36(c) (1).[2] First National, supported by the Comptroller of the Currency of the United States as intervenor, contends that its activities do not constitute "branching" as defined in Section 36(f) of the National Banking Act[3] and therefore are not within the coverage of Section 36(c) or Florida Section 659.06. The district court granted judgment for First National, stating explicitly: "Florida statute 659.06(1) (a) is not operative or controlling in this instance." We conclude that in this instance Florida law is operative and controlling and reverse.

For the purpose of the disposition of this case on appeal, and in view of our reversal in favor of the state comptroller, we adopt the statement of facts as presented by the United States Comptroller. The armored car service and off-premises receptacle at issue in this litigation were established in 1966. In August, 1965, First National inquired of the Comptroller of the Currency about the Comptroller's position on a national bank operating an armored car messenger service. The bank received a reply observing that such a service could properly be provided if the conditions established by the Comptroller's ruling in paragraph 7490 of the Comptroller's Manual were satisfied. Paragraph 7490 provides:

> To meet the requirements of its customers, a National Bank may provide messenger service by means of an armored car or otherwise, pursuant to an agreement wherein it is specified that the messenger is the agent of the customer rather than of the bank. Deposits collected under this arrangement are not considered as having been received by the bank until they are actually delivered to the teller at the bank's premises. Similarly, a check is considered as having been paid at the bank when the money is handed to the messenger as agent for the customer.

The bank subsequently inquired of the Comptroller of the Currency whether the bank could establish a receptacle at a shopping center for the receipt of night bags containing money and checks, which would be recovered daily from the receptacle by the messenger and taken to the bank for deposit. The Comptroller's regional counsel advised:

> A National Bank, as an incident to its banking business, may construct off of its premises a receptacle for the receipt of night bags containing cash and checks. The receptacle should contain thereon a notice clearly stating that the messenger who will recover the night bags is acting solely as the agent for the customer and that the funds will not be deemed a deposit until delivered to a teller on the bank premises. The notice may also advise that adequate insurance coverage will be provided and proper security measures taken. Such a service would not constitute branch banking as defined in 12 U.S.C. § 36(f).

Relying on these letters, First National in September, 1966, began operating an armored car service and an off-prem-

---

2. § 36. Branch banks

The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

  *    *    *    *    *

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question;

  *    *    *    *    *

3. § 36(f): "The term 'branch' as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent."

ises receptacle. These services were established according to the procedures described below.

The armored car messenger service was provided to call at a customer's place of business to pick up cash and checks for the purpose of transporting them to First National's banking house, where they would be deposited to the customer's account. The customers who used the service all had an account with the bank. Prior to using the service they signed a "Comprehensive Dual Control Contract" which provided that First National's messenger transported the monies to the banking house as the agent of the customer. When a customer sent funds to the bank, he accompanied them with a transmittal slip on which he itemized them. The transmittal slip contained a "Contract" which provided that the bank was acting as the agent of the customer, and that "the transmittal of said currency, coin and checks, shall not be deemed to be a deposit until delivered into the hands of the bank's tellers at the said banking house." Both the transmittal slip and the Comprehensive Dual Control Contract provided that the bank was maintaining hazard insurance for the protection of the principal.

The messenger service was also used to transport cash to those customers who had signed the Comprehensive Dual Control Contract. The Contract provided that in this situation, also, the bank's messenger would be acting as the agent of the customer. Sums transported to the customer by this method were accompanied by a charge slip indicating that the customer's account had been charged for the amount of the order. A common use of this service was the delivery of coins to be used as change by businesses.

The messenger service operated daily, six days a week. The armored car was owned by the bank, and operated by employees of the bank. The bank also purchased the insurance coverage for the operation. Customers were not charged for the service.

In a shopping center located one mile from its banking house, First National leased an area where it provided a secured receptacle for persons maintaining an account with the bank. The bank's customers who signed the "Comprehensive Dual Control Contract" were issued a key so that they could place night bags containing cash and checks in the receptacle. Additionally, other customers with an account at the bank could use the receptacle by placing their funds in the receptacle in an envelope containing the money and a transmittal slip. The envelopes and transmittal slips were provided at the receptacle. The envelopes stated that the funds transported were accepted in accordance with the contract printed on the transmittal slip, which was the same transmittal slip used with the armored car messenger service. In bold letters at the receptacle a sign stated:

> The messenger who will recover the funds in this receptacle twice daily is acting as the agent for the customer. The funds will not be deemed a deposit until delivered to the bank's premises at 302 W. Haines Street. Insurance coverage for the protection of the funds is provided by the First National Bank in Plant City.

The armored car transported the funds placed in the receptacle to the banking house.

Shortly after First National had placed the two services into operation, the State Comptroller advised the bank that its armored car and shopping center receptacle activities violated Florida law and requested the bank to cease and desist from these operations. First National then brought this action for declaratory relief and an injunction against the State Comptroller, contending its activities were authorized by paramount federal law and thus could not be interfered with by the state authorities. The defendant state banks intervened on the side of the State Comptroller, and the federal Comptroller intervened as a plaintiff.

The district court, by a decision of May 6, 1967, awarded partial summary judgment in favor of First National and the federal Comptroller. The court ruled, as a matter of federal law, that the definition of "branch" in 12 U.S.C. § 36(f) was exclusive, and that under that definition there was no "branch" involved here; thus the state law, incorporated into federal law by 12 U.S.C. § 36(c), did not apply.

On June 2, 1967, the district court issued its final judgment, declaring that the messenger service and off-premises receptacle as authorized by the federal Comptroller were not branches within the meaning of 12 U.S.C. § 36 (and the related provision, 12 U.S.C. § 81) and did not violate Florida law. The court limited the judgment to declaratory relief and did not issue an injunction (due to the state Comptroller's stipulation of intent to abide by the district court's order without further injunctive relief).[4]

The controlling issue of law in this appeal concerns the district court's choice of law, i. e., that court's failure to consult state law in determining whether First National's activities outside its main offices constitute "branch banking." Our answer to that issue will require an excursion into statutory history and case and statutory analysis.

Justice Clark, in First National Bank of Logan, Utah v. Walker Bank & Trust Company, 1966, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343, capsulates the early history of our national banking system, which was born in anguish and stunted in its early growth. Competition between state and federal banking systems was bound to breed conflicts, and until 1927 federal banks were handicapped considerably by the lack of statutory authority to establish branches, even in states which allowed branch banking. See First National Bank in St. Louis v. State of Missouri at inf. of Barrett, 1924, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486.[5] In 1927 Congress passed what became known as the McFadden Act, which sought to relieve federal-state abrasions through statutory complementariness. The McFadden Act permitted national banks to establish branches inside the municipality of the main bank, provided that the state in which the bank was located allowed branch banking. Extended in 1933 to grant certain additional branching powers, the 1927 Act forms the basis of the present Section 36(c) of the National Banking Act.

In the *Walker Bank* case, supra, Justice Clark, after concluding his historical analysis of the National Banking Act, returned to consideration of the present statute with the following words:

> "It appears clear from this résumé of the legislative history of § 36(c) (1) and (2) that Congress intended to place national and state banks on a basis of '*competitive equality*' insofar as branch banking was concerned." 385

4. The above statement of facts is found at pp. 2–8 of the United States Comptroller's appellate brief. Contestations of these facts concern the extent of First National's continuous compliance with the above procedures relating to contract and agency. We do not find such disputes relevant in light of our decision.

5. Although the actual holding in that case was the application of a state anti-branching statute applicable to a national bank within that state, the Court at one point in its opinion did deny the existence of any national bank's authority to establish a branch. 263 U.S. at 656–658, 44 S.Ct. 213. Moreover, later in the opinion the Court commented:

> "[N]ational banking associations have gone on for more than half a century without branches, and upon the theory of an absence of authority to establish them. If the nonexistence of such branches, or the absence of power to create them, has operated or is calculated to operate to the detriment of the government, or in such manner as to interfere with the efficiency of such associations as federal agencies, or to frustrate their purposes, it is inconceivable that the fact would not long since have been discovered and steps taken by Congress to remedy the omission." 263 U.S. at 659, 44 S.Ct. at 216.

U.S. at 261, 87 S.Ct. at 497. [Emphasis added.]

The United States Comptroller in *Walker Bank* had argued to the Supreme Court that if state law allows *any type* of branching, the prohibitions in Section 36(c) are not applicable and, therefore, national banks may establish branches in violation of specific state regulations. Justice Clark's analysis demonstrates the Court's overwhelming acceptance of the philosophy of "competitive equality":

> "The Comptroller argues that Utah's statute 'expressly authorizes' state banks to have branches in their home municipalities. He maintains that the restriction, in the subsequent paragraph of the statute limiting branching solely to the taking over of an existing bank, is not applicable to national banks. It is a strange argument that permits one to pick and choose what portion of the law binds him. Indeed, it would fly in the face of the legislative history not to hold that national branch banking is limited to those States the laws of which permit it, and even there 'only to the extent that the State laws permit branch banking.' Utah clearly permits it 'only to the extent' that the proposed branch takes over an existing bank.

> "The Comptroller also contends that the Act supersedes state law only as to 'whether' and 'where' branches may be located and not the 'method' by which this is effected.

> "We believe that where a State allows branching only by taking over an existing bank, it expresses as much 'whether' and 'where' a branch may be located as does a prohibition or a limi-

tation to the home office municipality. *As to the restriction being a 'method,' we have concluded that since it is part and parcel of Utah's policy, it was absorbed by the provisions of §§ 36(c) (1) and (2), regardless of the tag placed upon it."* 385 U.S. at 261–262, 87 S.Ct. at 497. [Emphasis added.]

The philosophy of "competitive equality" clearly had been dominant in the minds of the 1927 and 1933 legislators; however, before *Walker Bank*, courts had sometimes subordinated it to the desire to adhere to federal law. See First National Bank of Smithfield v. Saxon, 4 Cir. 1965, 352 F.2d 267, 271–272 (which the Supreme Court in *Walker Bank* expressly found to be in conflict with the decisions which it was affirming); Camden Trust Co. v. Gidney, 1962, 112 U.S. App.D.C. 197, 301 F.2d 521, cert. den., 369 U.S. 886, 82 S.Ct. 1158, 8 L.Ed.2d 287 (in which the Court refused to classify a "new" bank as a branch, and in doing so completely ignored the contention by the State of New Jersey, in an amicus brief, that permission for such operation would not be granted to a state bank); Whitney National Bank v. Bank of New Orleans and Trust Co., 1963, 116 U.S.App.D.C. 285, 323 F.2d 290, reversed on other grounds, 1965, 379 U.S. 411, 85 S.Ct. 551, 13 L.Ed.2d 386 (in which the Court classified a "new" bank as a branch, but did so without reference to state law); Jackson v. First National Bank of Valdosta, M.D.Ga.1965, 246 F.Supp. 134, 138 (in which the Court stated specifically: "This court is convinced that in construing the definition of 'branch' found in 12 U.S.C.A. § 36(f) it should be guided by federal considerations.").[6]

---

6. A persuasive argument against complete "competitive equality" as to branch banking can be found in Comment, "Federalism in Interpretation of Branch Banking Legislation," 32 U.Chi.L.Rev. 148 (1964). The author in this pre-*Walker Bank* Comment urges that federal courts adopt federal definitions of the term "branch" based essentially on the economical realities of banking. Al-

though well-reasoned and well-documented, the Comment fails in its attempt to justify its position in regard to the National Banking Act, and specifically Section 36(c). Compare Note, 64 Mich. L.Rev. 155 (1965) which espouses the philosophy of "competitive equality." See also Comment, "Branch Banking: The Current Controversy," 16 Stanford L.Rev. 983 (1964), which pictures the

Following the above authority, First National attempts to convince us that Section 36(f) of the National Banking Act is still the sole and monolithic definer of "branch." Then, by taking us through some labyrinthian and meandering paths of the laws of agency and contract, First National seeks to demonstrate that it has not established offices or agencies, where, as specified in Section 36(f), "deposits are received, or checks paid, or money lent." Such a line of argument, even before *Walker Bank*, would not have been acceptable in our Circuit. Now it is indefensible.

In 1965 our Court held that courts must not look to Section 36(f) as their sole guiding light but must permit rays of state law to refract and reflect their statutory vision. In Jackson v. First National Bank of Valdosta, 5 Cir. 1965, 349 F.2d 71,[7] we quoted Section 36(c) and Section 36(f) and then concluded:

"Thus, a national banking association is precluded from opening any office at which deposits are received, checks paid, or money lent unless a similarly situated state bank would be authorized under state law to open a similar office. In this way, Congress sought to insure equality between state and national banks regarding the establishment of branches." 349 F.2d at 72.

After quoting the applicable state statute, we continued.

"Therefore a state bank, located at Valdosta, already having one office or facility in that city, could not open another office or facility there. Consequently, First National likewise could not, under § 36(c) open such a facility." 349 F.2d at 73.

Finally, in discussing the application of Section 36(c), we espoused what was later to be adopted by the Supreme Court as the policy of "competitive equality":

"That statute [Section 36(c)] is explicit in providing that the substantive law of the state in which each national banking association is located fixes the bounds of such association's branching authority. We agree with the district court in this case and South Dakota, supra [State of South Dakota v. National Bank of South Dakota, D.S.D.1963, 219 F.Supp. 842] at 846, that Congress did not have to give this effect to state law. But it is highly significant that Congress did give it such effect and that it did so pursuant to a strong and distinct *'policy of equalization'* for our dual banking system." 349 F.2d at 74. [Emphasis added.]

Our opinion in *Jackson* was relied on extensively in State Chartered Banks in Washington v. Peoples National Bank of Washington, No. 6338 W.D. Wash.1966, 291 F.Supp. 180, a case in which the exact legal issue at bar was squarely before the court. We therefore quote from it liberally:

"The issue on the merits is whether the proposed drive-in facility is an illegal branch of a national bank under the provisions of 12 U.S.C. § 36. The conditions upon which a national banking association may establish and operate a branch, as set forth in section 36, in effect incorporate state laws. These state laws relate to the establishment and operation of branches as authorized to state banks. Therefore, in construing federal law, the court must also construe the pertinent banking laws of the State of Washington." 291 F.Supp. 188.

---

relatively recent re-emergence of this issue into the political arena. In Comment, "Present Banking Structure in Florida and Branch Banking," 20 Florida L.Rev. 84, 98–101 (1967), the authors relate the *Walker Bank* decision to current Florida law and even mention the opinion of the district court in the case at bar.

**7.** Our opinion in *Jackson* preceded the district court's published opinion on remand, cited supra. As is evident from our excerpts from the two opinions, the distinguished district judge at that time espoused a different view as to the priorities of branch banking legislation than that expressed in the opinion by our Court.

\* \* \* \* \* \*

"The scope of the term 'branch' is set forth in section 36(f). That section states the term 'branch' shall be 'held to include any branch bank, branch office \* \* \* additional office \* \* \* at which deposits are received or checks paid, or money lent.' Some writers have considered this section as defining the word 'branch.' Judge Holtzoff referred to this subsection as a definition [in Michigan National Bank v. Saxon, D.C. 1962, Civil No. 82162 (unpublished opinion)] and so did Judge Bootle [in Jackson v. First National Bank of Valdosta, supra]. It is with much respect and deference that I venture to disagree with their characterization. I feel that the section should not be given the prestige of a definition if it does not meet the standards of a definition. Congress has nearly two hundred years of experience in enacting statutory definitions. If that body had wished to formulate a true definition I do not believe that the term defined would have appeared as both the subject and the predicate of the definition. Further, the opening paragraph of section 36 clearly indicates that the section was not intended to provide any definitions as such. It states:

" 'The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:'

"Subsection (c) [sic] of Section 36 may be a partial definition or a description of what *may be* included within the term 'branch.' It was not intended to be exhaustive. It provides only a broad, functional measuring gauge of what a branch may be. As I read it, the words 'additional office \* \* \* at which deposits are received, or checks paid, or money lent,' provide only a partial, functional definition for determining *prima facie* if the supplementing state branching law should come into play. This is what I feel is the import of the Court of Appeals' decision in Jackson v. First National Bank of Valdosta, 349 F.2d 71.

"In the *Valdosta* case the state superintendent of banking, by issuing regulations, chose to expand somewhat this partial definition of 'branch.' The regulations provided that if the drive-in teller facilities were within the boundaries of a single contiguous area, or were across the street but connected by a tunnel or overhead passage, it would not be considered as a branch; it would instead be considered as an expansion of the existing facility. Therefore, when looking at a new national bank facility in Georgia the Comptroller is *required* (by the *Georgia* law) to consider contiguity and physical connection; these may determine the character of the facility. This decision makes it fairly clear that once the facility passes the broad functional test set forth in section 36(f) the state law takes over and may further define 'branch' in such a way as to comport with the state's banking policy. This was precisely the purpose Congress had in mind when it passed the McFadden Act. See Walker Bank & Trust Company v. Saxon [10 Cir., 352 F.2d 90], supra [the case which was later affirmed by the Supreme Court]. The *Walker* case also emphasized the role of state law in branching by saying, 'We believe the proper approach is for the Comptroller to look at all the State law on branch banking not just part of it.' Id., p. 94. But see First National Bank of Smithfield, N. C. v. Saxon, 352 F.2d 267, 271 (4 Cir. 1965) [see our mention of this case, supra, and its treatment by the Supreme Court in the *Walker Bank* decision].

"The test of 'branchness' in this situation is therefore twofold—(1) Does the facility fit the broad functional definition laid down by Congress in Section 36(f), and if so, (2) Does the state law add any more refinements to the definition?

"Although defendant argues that *Peoples Bank* fails to meet the requirements of section 36(f), it admits (or rather does not contest) the fact that the proposed facility will receive deposits and pay checks. However, the defendant asserts that 'only a part'—25%—of the check-cashing process will be carried out at the proposed facility. They claim

that the physical acceptance of the check and payment of the money to the payee constitute only about 25% of the operations connected with check cashing. The remaining operations, such as entry on the books and transmittal of the instrument to the drawee bank, make up the other 75% of the check-cashing process. That may well be. However, the check is nevertheless cashed within the meaning of section 36(f) when the instrument is accepted from and the money paid to the holder. The remaining operations are done so that the transaction is reflected on the books of the bank and to insure that the cashing bank is repaid by the drawee bank.

"When the bank accepts the instrument and pays the holder the check is 'cashed,'—*all* cashed, not 25%, or 50%, but 100% cashed. True, the remaining operations are part of the *check-cashing process,* but the act of check-cashing is complete after receipt of the check and payment of the money; and it is the *act* of check-cashing that is contemplated by section 36(f). The reason for making this distinction is because the defendant in argument attempted to equate the act of check-cashing with the process of check-cashing. They are not identical. This effort at blurring the differences was apparently done for the purpose of showing 'oneness' between the new facility and the principal office at 222 Williams Street. However, 'branchness' is a combination of function and physicality —not bookkeeping. See Jackson v. First National Bank of Valdosta, 246 F.Supp. 134 (D.Ga.1965). And any effort to inject the 'unity of operation' test into this case is merely another attempt to avoid confrontation with state law. This test was rejected by the district court in *Bank of Valdosta* and under banking laws more liberal than those in the State of Washington.

"Having discussed functional characteristics under the federal statute, we now turn to the physical aspect. *Prima facie,* can the proposed facility be properly termed an 'additional office?' If it can, we have passed over the threshold of federal law and must then turn to state law for a full consideration of this facility's character. This proposed facility is some 260 feet or more from the principal office, on a separate lot, in another block, across a busy thoroughfare, has a different address, and is in a completely disconnected building. No stretching of the term 'additional office' is required at all to see it fits perfectly. The proposed facility is therefore a 'branch' within the meaning of the federal statute (12 U.S.C. § 36(f)).

"From this point forward, the state statutes and their interpretation as applied to state banks and their branches become the controlling law in determining whether this facility is to be considered a branch or not. This has been plainly stated as noted earlier in this opinion in Jackson v. First National Bank of Valdosta, 349 F.2d 71, and Walker Bank & Trust Company v. Saxon, supra. The rest of the inquiry is therefore confined to ascertaining what category this facility falls into if it were being constructed solely under the dominion of state law." 291 F.Supp. p. 196.

\*  \*  \*  \*  \*  \*

"It is a branch.

"It is a branch and it would seem that the Comptroller would have found it to be a branch if he had measured this proposal by the state law of Washington. But he did not. He ignored it, as the Deputy Comptroller stated in his testimony on the stand. In deciding upon the character of this structure the Comptroller did not even consider state law. His apparently deliberate non-observance of the state law was arbitrary, not in accordance with the law, not in accordance with the procedure required by the law, and unwarranted by the facts. See Jackson v. First Nat. Bank of Valdosta, 349 F.2d 71." 291 F.Supp. p. 197.

The above analysis by Judge Lindberg represents an accurate and perceptive application of our statement of policy in *Jackson,* and we subscribe to it without hesitation. We do so on two important grounds. First, we cannot aid and abet

First National's attempt to evade the wishes of Congress by an adroit manipulation of statutory language. Second, we will not choose to overlook state law in penumbral areas when the thrust of the National Banking Act is "competitive equality" between national and state branching authority.

Congress is in the defining business and is knowledgeable as to how to immunize or deimmunize an activity from its statutory engulfment. In Section 36(f) Congress provided only that the term "branch" "shall be held to include" these offices which engage in the receipt of deposits, the paying of checks, or the lending of money. Such a provision is hardly adequate as a definition because it merely sets out in general terms what everyone knows to be the life-blood functions of banking. If we construed Section 36(f) as permitting paper evasions from state anti-branching laws, we would be letting the left hand give and the right hand take away. Statutory construction has not fallen to such legalistic depths. We repeat the words of Judge Gewin, speaking for our Court en banc, in Miller v. Amusement Enterprises, Inc., 5 Cir. 1968, 394 F.2d 342, 353:

> "We are not only dealing with the language of the statute, but we must look as well to the logic of Congress and the broad national policy which was evidenced by its enactment. Our system does not favor mechanical jurisprudence; it seeks to find the purpose and spirit of a statute and the intention of its makers. Holy Trinity Church v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226, 228; National Woodwork Manufacturers Asso. v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357, 364."

See also Lawson v. Suwanee Fruit & Steamship Co., 1949, 336 U.S. 198, 200–201, 69 S.Ct. 503, 93 L.Ed. 611, 614–615, applying the above principles to statutory definitions.

Having concluded that Congress did not seek to devitalize Section 36(f) with eternally static concepts, we likewise conclude that flexibility is to be accorded not by any federal common law of branching, but rather by recourse to state law. To hold otherwise would violate the specific teachings of *Jackson* and *Peoples National Bank* and would would severely challenge the policy of "competitive equality" which the Supreme Court has so recently established. It would allow the United States Comptroller, by means of oracular definitions, to distort what states believed was banking into non-banking. To be sure, national banks may well fear the authority of state comptrollers to make extreme use of this same defining process, but their recourse must be to Congress which legislated "competitive equality," not to the courts who must follow it.

Although there are acerbities and exacerbations natural to our dual banking system, Congress has sought to provide competitive access to the marts of banking. The Congressional enactments do not assure economic equilibrium, but they do assure a measure of equality of economic opportunity. We therefore refuse to tread the twisting paths of agency and contracts urged upon us in this case and look instead to the laws of Florida.

Section 659.06(1) (a) of the Florida Statutes, F.S.A., note 1 supra, is quite broad in stating that a bank "shall have only one place of doing business." As yet, no court opinion has considered the applicability of this statute to receptacle and armored car services, although a similar action is now pending in a Florida state court. Dickinson v. The Tallahassee Bank and Trust Co., 2d Jud. Cir., Leon County No. 68–30.[8] The Comptroller of the State of Florida, however, in his letter to the First National dated September 28, 1966, specifically ruled that "these two activities are in violation

---

8. On January 18, 1968, the state court approved a request for a form of abstention-in-reverse and reset the final

hearing in its case until after our Court had interpreted the Florida statute in the case at bar.

**558**

of Section 659.06(1) (a), Florida Statutes." Such a ruling may sometimes constitute the only "law" of the state, cf. United States v. Howard, 1957, 352 U.S. 212, 77 S.Ct. 303, 1 L.Ed.2d 261, and we should follow it when, as here, it appears consistent with the policy of the state statute. See Jackson v. First National Bank of Valdosta, supra, 349 F.2d at 73.[9]

The Florida statute permits only one place of business, and this direction is uncomplicated, unhedged, and unmodified. "Doing business" in Florida can be minimal. Cf. Phillips v. Hooker Chemical Corp., 5 Cir. 1967, 375 F.2d 189. Unless we were to cast away all concepts of the functional "business" of a bank, we would have to conclude that First National was "doing business" with its extra services.

As is indicated by the pending litigation, our opinion will probably not be the final interpretation of Florida law as it relates to the activities in question. On remand, therefore, the district court should enter a conditional decree in order that the judgment in this particular controversy is not deemed res judicata in the event of a conflicting statutory interpretation by the Florida state courts. Such remedy was clearly provided for in Burton v. State Farm Mutual Automobile Ins. Co., 5 Cir. 1964, 335 F.2d 317, 324, where Judge Brown stated:

> "[W]here things depend on the outcome of litigation elsewhere, or future developments as to controlling substantive or procedural law, the Federal Court has the power—and the duty where appropriate—to enter a conditional order or decree."

The district court should retain jurisdiction, and if Florida law is ultimately determined to be different than here expounded, the court can re-lense its optical view of First National's activities as they relate to Section 36(c) of the National Banking Act.

Reversed and remanded for entry of a judgment in accordance with this opinion.

---

9. Compare Leuthold v. Camp, D.Mont. 1967, 273 F.Supp. 695, 699 (at [11]), where that court found that the Montana Attorney General's ruling was inconsistent with the applicable state statutes.