**INDEPENDENT BANKERS OF OREGON, Plaintiff,**

v.

**William B. CAMP, Comptroller of the Currency, and United States National Bank of Oregon, Defendants.**

**John OLIN, Superintendent, Banking Division, Department of Commerce, State of Oregon, Plaintiff,**

v.

**William B. CAMP, Comptroller of the Currency, and United States National Bank of Oregon, Defendants.**

**Civ. Nos. 72–528, 72–535.**

United States District Court, D. Oregon.

March 20, 1973.

---

Daniel A. Ritter, Harland, Winslow, Ritter & Haenny, Salem, Ore., for plaintiffs Independent Bankers of Oregon.

Robert D. Geddes, Asst. Atty. Gen., Department of Justice, Salem, Ore., for plaintiff Olin.

Robert Huntington, Davies, Biggs, Strayer, Stoel & Boley, Portland, Ore., for defendant United States National Bank of Oregon.

Sidney I. Lezak, U. S. Atty., Jack G. Collins, Asst. U. S. Atty., Portland, Ore., for defendant William B. Camp, Comptroller of the Currency.

## OPINION

SKOPIL, District Judge:

### I

### INTRODUCTION

In November of 1971, the United States National Bank of Oregon (hereafter, "U. S. National") applied to the Comptroller of the Currency (hereafter, "Comptroller") for permission to open two new branches in Oregon. They were to be located in relatively new shopping centers, one in Lancaster Mall in Salem, and the other in Eastport Plaza in Portland. The proposed new branches were about 325 feet and 1,000 feet, respectively, from existing U. S. National Branches. The proposed new branches were not to be traditional bank offices. U. S. National intended to install automated tellers which would receive deposits, dispense predetermined amounts of cash, and perform a few other banking services without the presence of bank employees. The customer uses these machines by inserting his specially coded Bankamericard and operating the controls.

Upon notification, competing banks and the Superintendent of Banks for the

State of Oregon (hereafter, "Superintendent") protested the applications. The Regional Administrator of National Banks held a public hearing in Portland on January 12, 1972, and took oral and documentary evidence. The Comptroller ultimately decided in favor of U. S. National in an opinion dated June 20, 1972.

The two shopping centers are relatively new, large, and busy ones. The Comptroller's principal emphasis in granting these applications was on the advantages of automated tellers in such areas. Specifically, they are available for use around the clock, while traditional branches are closed at times when shopping is heaviest. Therefore, the automated tellers would be especially useful and convenient and would also put competitive pressure on traditional banks to extend their banking hours.

The other banks and the Superintendent opposed the applications on several grounds. The banks feared that automated tellers would be a cheap way for U. S. National to preempt potentially valuable branch locations.[1] Although the volume of business at a particular location may not justify the expense of a traditional branch, it might support an automated teller until such time as it was profitable to convert into a traditional branch. The other banks felt this put them at a competitive disadvantage,[2] and for the state banks, this disadvantage was especially severe. The Superintendent took the position that off-premises automated tellers violated state banking law and could not be employed by state banks. He urged his position before the Comptroller, who concluded that the Superintendent's interpretation of the state law was not binding upon him, that the state law did not forbid automated tellers to state banks, and that even if it did, national banks are not subject to the prohibition.

U. S. National, the plaintiff banks, the Superintendent, and the Comptroller all renew their legal claims in these proceedings. Plaintiffs seek a permanent injunction against the automated tellers, and both plaintiffs and defendants have moved for summary judgment on the record. There is no substantial factual dispute, for the decision depends entirely upon the proper interpretation of state and federal branching law. Summary judgment is appropriate.

## II

■ The federal branch banking statute permits national banks to establish and operate new branches only to the extent permitted state banks by state law. 12 U.S.C. § 36(c). State restrictions on branch banking are of several kinds. Some states forbid it altogether. First National Bank v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); Jackson v. First National Bank of Cornelia, 292 F.Supp. 156 (N.D.Ga. 1968). Others have geographical limitations which sometimes depend on the presence or absence of competing banks. Ohio Bank & Savings Co. v. Tri-County National Bank, 411 F.2d 801 (6th Cir. 1969); American Bank & Trust Co. v. Saxon, 373 F.2d 283 (6th Cir. 1967); First Hardin National Bank v. Ft. Knox National Bank, 361 F.2d 276 (6th Cir.), cert. denied 385 U.S. 959, 87 S.Ct. 394, 17 L.Ed.2d 304 (1966); Union Savings Bank of Patchogue v. Saxon, 118 U.S. App.D.C. 296, 335 F.2d 718 (1964); Commonwealth of Virginia ex rel. State Corporation Commission v. Camp, 333 F.Supp. 847 (E.D.Va.1971); State of South Dakota v. National Bank of South Dakota, 219 F.Supp. 842 (D.S.D.1963), aff'd 335 F.2d 444 (8th Cir. 1964), cert. denied 379 U.S. 970, 85 S.Ct. 667, 13 L. Ed.2d 562 (1965). Some statutes permit branch banking only if the branch is

---

1. The installations cost only $30,000 to $50,000.

2. U. S. National and the First National Bank of Oregon, both of which issue

Bankamericards in Oregon, are the second largest and the largest banks in Oregon, respectively. Together they have approximately 74% of total deposits.

the former main office of a bank acquired by merger or otherwise. First National Bank of Logan v. Walker Bank & Trust Company, 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); Leuthold v. Camp, 273 F.Supp. 695 (D.Mont.1967), aff'd per curiam 405 F.2d 499 (9th Cir. 1969). Still others forbid new branches unless they meet criteria of public interest, convenience, and the like. First National Bank of Fairbanks v. Camp, 465 F.2d 586 (D.C.Cir. 1972); First-Citizens Bank & Trust Co. v. Camp, 409 F. 2d 1086 (4th Cir. 1969); Clermont National Bank v. Citizensbank National Association, 329 F.Supp. 1331 (S.D.Ohio 1971); First National Bank of Catawba County v. Wachovia Bank & Trust Co., 325 F.Supp. 523 (M.D.N.C.), aff'd per curiam 448 F.2d 637 (4th Cir. 1971). All of these restrictions are applicable to national banks. The rationale of the statute and the case law is the policy of competitive equality, which requires that neither state banks nor national banks secure an advantage over the other by means of unequal applicability of state law to their branching rights. First National Bank v. Dickinson, *supra;* First National Bank of Logan v. Walker, *supra;* Springfield State Bank v. National State Bank of Elizabeth, 459 F.2d 712 (3rd Cir. 1972).

Oregon statute law affirmatively permits state banks to have branches, provided certain conditions are met. O.R.S. §§ 714.020 and 714.030. State banks must secure the approval of the Superintendent, who is to apply the same criteria required to be met by applications for establishing new banks. O.R.S. § 714.040. There are geographical and capital restrictions which, however, have been met by the proposed branches in this case and are not an issue. O.R.S. §§ 714.050 and 714.060.

State branching law also requires the banks to report deposits received and held by each branch, to pay an examination fee based on the liabilities carried at the branch, and to display the words "branch" or "office" on window signs, advertising and letterheads. O.R.S. §§ 714.080, 714.090 and 714.100. The Superintendent argues that these statutes contemplate only traditional branches manned by people and that the automated tellers cannot comply with the statutes because there will be no deposits or other liabilities held at the automated teller, nor apparently will there be windows and letterheads.

Since the official who approves new branch applications must apply the criteria for new bank applications, the Superintendent also invokes O.R.S. § 707.-080. Those criteria which he claims are not met by automated tellers are: (a) that the proposed branch will be formed for legitimate objects as contemplated by the Bank Act; (d) that there is reasonable assurance of sufficient volume of business so that the proposed bank or trust company will be successful; (e) that the proposed branch is justified; and (f) that it will promote the public convenience and advantage. The Superintendent claims that since the automated tellers will not hold deposits and keep records, they are not being installed for these legitimate objects. Also, since the automated teller does not itself earn income on any of its transactions, it cannot itself show a profit. Therefore, it cannot be assured of the success required by statute. The Superintendent further claims that the proposed automated teller is not justified because of the reasons already stated. Finally, he points out that since the automated tellers will serve only Bankamericard customers,[3] and not the public in general, it cannot be said that they promote the public convenience and advantage. In fact, it is actually the merchants of the shopping centers who will benefit by being relieved of cashing a certain number of checks.

The Comptroller argues first that state law binds him only insofar as it places restrictions on whether a branch may be opened, and not what kind. Al-

---

3. Including those who have Bankamericards issued by other banks.

though nearly all of the cases deal only with the former question,[4] the latter is inherent in the statutes. Section 36(c) governs not only the establishment of branches, but also their operation.

■ The Comptroller next argues that even if state law is applicable, he is free to interpret it himself and is not bound by what he feels is the Superintendent's erroneous interpretation. Some courts have given binding weight, or very near to it, to the interpretation of the state administrative officer. First National Bank v. Dickinson, 400 F.2d 548 (5th Cir. 1968), aff'd on other grounds 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969);[5] Jackson v. First National Bank of Cornelia, *supra*. However, more have decided the opposite way, apparently including this circuit. First National Bank of Fairbanks v. Camp; Union Savings Bank of Patchogue v. Saxon; Commonwealth of Virginia ex rel. State Corporation Commission v. Camp; Leuthold v. Camp; State of South Dakota v. National Bank of South Dakota; all *supra*. The Superintendent's interpretation at least is entitled to respect and consideration. Lincoln Bank & Trust Co. v. Exchange National Bank & Trust Co., *supra;* Bank of Dearborn v. Saxon, 244 F.Supp. 394 (E.D.Mich.1965), aff'd 377 F.2d 496 (6th Cir. 1967).

In an uncontradicted affidavit, the Superintendent stated that he has denied for the same legal reasons an application by a state bank to operate a comparable automated teller. He has also denied one branch application for failure to designate the individuals to staff it, and another for lack of reasonable assurance that the branch would be profitable in itself, rather than merely contributing to the profitability of its parent bank. Although he has permitted a bank to operate a mobile branch which visits small communities on particular days, he claims that this facility is distinguishable from the automated tellers. It is manned by people, holds deposits, and has customer ledgers.

The Comptroller dismisses the Superintendent's statutory arguments. The statutes do not require a bank to hold deposits or have windows, but only prescribe what is to be done if they do. The automated tellers will obviously have some legitimate objects, and the Comptroller found various reasons why they are justified and in the public interest.

■■ Plaintiffs are probably right in saying that the legislature did not contemplate automated tellers when it enacted these statutes. The Comptroller has to strain to fit automated tellers easily within them, and the Superintendent similarly has to strain to find in the statutes the prohibition against them. However, the demands of 12 U.S.C. § 36(c) are not satisfied by statutory neutrality or inattention. Like the establishment of a branch, the operation of one is permitted only if such operation is authorized "affirmatively and not merely by implication or recognition" by the statute law of Oregon. The Supreme Court has said that state law "comes into play in deciding how, where and when branch banks may be operated," and the question here obviously is one of how a branch bank may be operated. First National Bank v. Dickinson, *supra*. The state statutes in question permit a bank to "establish or operate a branch" only as provided in Chapter 714, O.R.S. § 714.020. Therefore, in the absence of a specific statute permitting automated branches to state banks, they are unavailable to national banks. Whether or not this technological innovation should be encouraged is a question for the state legislature to consider,

---

4. But see Lincoln Bank & Trust Co. v. Exchange National Bank & Trust Co., 383 F.2d 694 (10th Cir. 1967).

5. Although the Supreme Court ruled that the definition of a branch was purely a matter of federal law, it did not decide whether a state officer's opinion might be binding where state law governed.

not this Court. The principle of competitive equality is particularly pertinent in situations like this where, because of statutory vagueness, the Superintendent and Comptroller would arrive at opposite interpretations, resulting in potentially severe competitive inequality between state and national banks. Lincoln Bank & Trust Co. v. Exchange National Bank & Trust Co., *supra,* 383 F.2d at 699–700.

Although the Court has concluded that for the most part the statutes neither prohibit nor authorize automated tellers, there is one particular in which the Superintendent's interpretation seems sound. As previously discussed, a new branch may not be approved unless its opening will promote the public convenience and advantage. O.R.S. § 707.-080(f). The use of these automated tellers is rather severely restricted, i. e., only to holders of Bankamericards which have been specially coded for this service. Not only will the automated teller be unavailable to most of the general public, e. g., for cashing paychecks or checks drawn on U. S. National, but the cash withdrawal service to be provided Bankamericard holders by the automated teller is principally intended as a partial substitution for the check cashing by merchants in the shopping center.[6] The Superintendent interprets the statute to require more than this for the public convenience, and apparently demands of state banks licensed by him that they do more than serve their own customers. The Court respects his interpretation on this point. It should be noted that the advantages of automated tellers are not foreclosed to banks under state law, for they are now installed at many existing branch bank locations to provide around-the-clock service. However, the automated tellers are so restricted to a limited class of users that they fail to satisfy the law that new branches be found to promote the public convenience and advantage. Accordingly, it is

Ordered that plaintiffs' motions for summary judgment are granted, and the defendants' motions for summary judgment are denied. Plaintiffs shall submit an appropriate order.

---

6. It is interesting that at least one merchant in Lancaster Mall, Montgomery Wards, cashes checks for customers and non-customers alike. In a sense it is providing broader banking service than the automated tellers would.