**Howard B. BROWN, Banking Commissioner, State of Connecticut, Plaintiff–Appellee,**

**v.**

**Robert L. CLARKE, Comptroller of the Currency, Defendant–Amicus Curiae,**

**and**

**First National Bank of Stamford, Defendant–Appellant.**

**No. 1016, Docket 88–6305.**

United States Court of Appeals, Second Circuit.

Argued April 24, 1989.

Decided June 29, 1989.

Andrew P. Nemiroff, Stamford, Conn. (Epstein & Fogarty, Stamford, Conn., of counsel), for defendant-appellant.

Jane D. Comerford, Asst. Atty. Gen., State of Conn., Hartford, Conn. (Clarine Nardi Riddle, Acting Atty. Gen. State of Conn., Hartford, Conn., of counsel), for plaintiff-appellee.

John R. Bolton, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Stanley A. Twardy, Jr., U.S. Atty. D. Conn., New Haven, Conn., Anthony J. Steinmeyer, Robert D. Kamenshine, Civil Div., Dept. of Justice, Washington, D.C., for amicus curiae.

Before OAKES, Chief Judge,
MESKILL and WISDOM *, Circuit Judges.

WISDOM, Senior Circuit Judge:

This case involves the issues whether a deposit pick-up service operated by the First National Bank of Stamford, Inc. for the convenience of its customers constitutes a "branch" under the National Bank Act, 12 U.S.C. § 36(f) and, if so, whether its operation violates the restrictions on branch banking set forth in 12 U.S.C. § 36(c). The facts of this case are undisputed; the twist comes in the change of position taken by the Comptroller of the Currency at the trial and appellate levels. We recount only those facts relevant to the resolution of the issues remaining on appeal.

I

The First National Bank of Stamford, Inc. (FNB), is a banking association chartered by the Comptroller of the Currency, incorporated under the laws of the United States, and authorized to engage in the business of banking under the National Bank Act.[1] FNB's main and only office is in Stamford, Connecticut. For the benefit of its customers in Stamford, Norwalk, Darien, and Greenwich, Connecticut, FNB has provided a messenger service to collect deposits from customers. The service, which FNB has operated for the past two years, is offered through an agreement between FNB and the customer in which the customer appoints as his agent an FNB employee to collect funds and deliver them to a teller at FNB's office in Stamford. FNB furnishes the vehicle the messenger uses to transport the deposits to the bank. Under the terms of the agreement the funds collected by the messenger are not considered "received by the Bank until such deposits have actually been delivered by messenger to the teller at the Bank's premises".

In a letter dated February 4, 1987 to the Comptroller of the Currency, the Connecticut State Banking Commissioner objected to FNB's messenger service because it constituted unauthorized branch banking in violation of 12 U.S.C. § 36(c). The Commissioner requested that the Comptroller order FNB to cease operating its messenger service. The Comptroller's District Counsel

---

* Of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

1. 12 U.S.C. § 21 et seq. (1940 & Supp.1989).

for the Northeastern District responded by rejecting the Commissioner's characterization of FNB's messenger service as a "branch" under 12 U.S.C. § 36(f). The District Counsel took the position that under the applicable statutes, case law, and an Interpretive Ruling issued by the Comptroller, FNB had not created a branch by providing its messenger service. The Commissioner brought suit in federal court seeking relief that would bar FNB's operation of the messenger service. The United States District Court for the District of Connecticut, T.F. Gilroy Daly, Judge, granted summary judgment for the Commissioner on the ground that the messenger service is a branch bank under 12 U.S.C. § 36(f) and its operation violates 12 U.S.C. § 36(c) because Connecticut law does not permit state banks to operate a branch in this manner.

In his *amicus-curiae* brief filed on appeal, the defendant Comptroller of the Currency made a u-turn. He renounced the District Counsel's former position and announced his agreement with the state banking Commissioner that FNB's messenger service *is* a branch. The Comptroller urges us to affirm the district court's summary judgment on the ground that FNB failed to obtain necessary approval from the Comptroller to operate the messenger service. Such approval could not have been given, the Comptroller maintains, both because the messenger service operates outside the geographic limits set out in the Connecticut branch banking statute and because Connecticut law does not expressly authorize a

state bank to operate a branch in this manner.[2]

## II

The National Bank Act, as amended by the McFadden Act,[3] governs the permissibility of establishing a branch of a national bank. The legislative history of these statutes has been carefully considered in numerous cases involving the nature and scope of the activities Congress intended to regulate as well as the broad policy objectives sought to be achieved through this regulatory scheme.[4] We need not, therefore, engage in a de novo review of the history and purpose of the federal branching provisions. In applying the appropriate federal and state provisions to FNB's messenger service, we are guided, however, by the McFadden Act's intended goal of re-establishing competitive equality between national and state banks insofar as branch banks are concerned.[5] The pertinent language of section 36(c) is straightforward:

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the City, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute

---

**2.** The Comptroller suggests, however, that because FNB did not obtain his approval to provide the service we need not reach the issue whether the service is permitted under Connecticut law. We discuss the effect of the Connecticut laws on branch banking, however, because the Comptroller initially viewed the messenger service as not being a branch under federal law and his failure to order the discontinuance of the service effectively amounts to approval. Because the Comptroller now supports the district court's ruling that the messenger service is a branch, we need not address the validity of the Comptroller's Interpretive Ruling relied on by the District Council in his response to the Commissioner.

**3.** Act of 25 Feb.1927 ch. 191, § 7, 44 Stat. 1224.

**4.** *See, e.g., Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); *First National Bank of Plant City v. Dickinson,* 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); *First National Bank of Logan v. Walker Bank & Trust Co.,* 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966); *Independent Bankers Ass'n of America v. Smith,* 534 F.2d 921 (D.C.Cir. 1976).

**5.** *Plant City,* 396 U.S. at 131, 90 S.Ct. at 342, 24 L.Ed.2d at 318; *Walker Bank,* 385 U.S. at 261, 87 S.Ct. at 497, 17 L.Ed.2d at 349. In *Clarke,* 479 U.S. at 401, 107 S.Ct. at 757, 93 L.Ed.2d at 770, the Court noted that before the enactment of the McFadden Act, the National Bank Act's place of business provision had been construed as prohibiting branching by national banks.

law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

12 U.S.C.A. § 36(c) (West 1989).

■ Although some courts have interpreted section 36(c) as not incorporating every state law restriction applicable to state banks,[6] it is well settled that section 36(c) authorizes branch banking by national banks only to the extent and in the manner expressly permitted state banks under the applicable state law.[7] The question whether a particular operation of a national bank is a branch, however, is answered solely by reference to federal law.[8]

### III

■ The starting point for determining whether FNB's messenger service is a branch is 12 U.S.C. § 36(f) which provides:

> The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business ... at which deposits are received, or checks paid, or money lent.

The controlling case addressing the question whether a messenger service is a branch under section 36(f) is *First National Bank of Plant City v. Dickinson.*[9] The national bank in *Plant City*, with the Comptroller's approval, offered two services for the convenience of its customers: an armored car messenger service and an off-premises receptacle for receipt of deposits. We reject FNB's suggestion that it was the combination of these services that created a branch; the Court made it clear that each was a branch independently of the other.[10] FNB attempts to distinguish its messenger service from that provided by the bank in *Plant City*. The messenger service in *Plant City* cashed customers checks in addition to collecting funds for deposit. A transmittal slip accompanying the check cashing transaction stated that the customer's account had been charged for the amount of the check. With respect to deposits, a contract between the bank and its customer provided that the messenger was the customer's agent; a transmittal slip used with deposits, however, stated that the bank was the messenger and agent for the customer.

FNB seeks refuge in its contractual arrangement whereby the customer appoints as his agent and messenger an employee of FNB. Additionally, FNB points out that its service is more circumscribed; it is limited to collecting funds for deposit. Notwithstanding this difference in the contractual arrangements and the more limited nature of the service provided by FNB, we find, as did the district court, a remarkable similarity in the essential characteristics of the messenger services provided in *Plant City* and in this case. Moreover, the effect of both services is the same—bank customers enjoy an added convenience; they are able to conduct some banking transactions at their homes or offices rather than having to go to the bank's office in Stamford. Contractual language used by FNB and the bank in *Plant City* stating that deposits are not deemed received until in the custody of the teller at the bank does not diminish the bank's competitive advantage over state banks gained by providing the messenger service. In *Plant City* the Court made it clear that the parties are free to arrange their rights and liabilities as they see fit but their decision to delay the creation of a debtor-creditor relationship until

---

**6.** See, e.g., *Driscoll v. Northwestern Nat'l Bank of St. Paul,* 484 F.2d 173 (8th Cir.1973).

**7.** See *Plant City,* 396 U.S. at 131, 90 S.Ct. at 342, 24 L.Ed.2d at 318; *Walker Bank,* 385 U.S. at 259–60, 87 S.Ct. at 496, 17 L.Ed.2d at 348–49; *Dakota National Bank & Trust Co. v. First National Bank,* 554 F.2d 345, 350 (8th Cir.), cert. denied, 434 U.S. 877, 98 S.Ct. 229, 54 L.Ed.2d 157 (1977); *Independent Bankers Ass'n v. Smith,* 534 F.2d 921, 931 (D.C.Cir.1976).

**8.** *Plant City,* 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed. 2d 312 (1969).

**9.** *Id.* at 135–37, 90 S.Ct. at 344–45, 24 L.Ed.2d at 321–22.

**10.** There was, however, a separate contract between the bank and the customer in which the customer appointed the messenger as his agent.

after the deposit funds are turned over to the teller does not affect the determination of whether the messenger service is a branch under section 36(f).[11]

Because the Comptroller now agrees with the state banking Commissioner that the service is a branch we need not address the question whether the District Counsel's pre-trial position or the Interpretive Ruling[12] relied on below is entitled to deference. The Supreme Court's analysis of the meaning of section 36(f) in *Plant City* controls this case.[13] That section's definition of a branch includes a place where "deposits are received". Penetrating the verbal walls of the contract to get at the meaning of the contract the Court in *Plant City* concluded that

> at the time a customer delivers a sum of money ... to the armored truck, the bank has, for all purposes contemplated by Congress in § 36(f), received a deposit.
>
>     \*    \*    \*    \*    \*    \*
>
> Since the putative deposits are in fact "received" by a bank facility apart from its chartered place of business, we are compelled in construing § 36(f), to view the place of delivery of the customer's cash and checks accompanied by a deposit slip as an "additional office, or ... branch place of business ... at which deposits are received".[14]

FNB is unable to distinguish its messenger service in any material respect from that in *Plant City*. We conclude that FNB's messenger service, which receives deposits at a location away from its main office, is a "branch" within the meaning of section 36(f).

As we noted earlier, 12 U.S.C. § 36(c) permits national banks to establish branch banks only to the extent and in the manner affirmatively and expressly prescribed by state law. Connecticut law permits limited branching by state banks meeting applicable capital and surplus requirements not at issue here. The statute applicable to state bank and trust companies provides in relevant part:

> (1) With the approval of the commissioner, any state bank and trust company ... may: (a) establish and operate one or more branches within the town in which such state bank and trust company is located; (b) establish and operate one or more branches in any town or towns within this state in which the main office of no state bank and trust company or national banking association is located.[15]

FNB argues that, because the Connecticut statute authorizes branch banking subject to only geographical limitations, its messenger service, if a branch under federal law, is permitted affirmatively by the state statute. We disagree.

---

**11.** *Plant City*, 396 U.S. at 136, 90 S.Ct. at 344, 24 L.Ed.2d at 321.

**12.** The district court based its conclusion that FNB's service is not a branch in part on an Interpretative Ruling, 12 C.F.R. § 7.7490 issued by the Comptroller before the *Plant City* decision. The Ruling, which was amended in 1971 to conform to *Plant City* suggests that FNB's type of messenger service, although not a branch under section 36(f), "may be limited" by section 36(c) because of that section's incorporation of state branching restrictions. We express no opinion regarding the validity or effect of this Interpretive Ruling. In its *amicus-curiae* brief the Comptroller states that the Ruling is undergoing further revision in the light of *Plant City.*

**13.** We, therefore, also need not decide the appropriate degree of deference, if any, the Comptroller is entitled to regarding his position on

appeal because his construction of the statute is now in complete conformity with the *Plant City* decision.

**14.** *Plant City*, 396 U.S. at 137, 90 S.Ct. at 345, 24 L.Ed.2d at 322. *See also Independent Bankers Ass'n of America v. Smith*, 534 F.2d 921, 951 (D.C.Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976) ("[R]egardless of private contract law and superficial form, any facility that performs traditional bank functions of receiving or disbursing funds is a 'branch' of a national bank ... if (1) the facility is ... owned or rented by the national bank, and (2) it offers the bank's customers a convenience that gives the bank a competitive advantage over other banks....").

**15.** Conn.Gen.Stat. § 36–59 (West 1988). *See also* Conn.Gen.Stat. § 36–129 (providing the same branching privileges for state savings banks).

The flaw in FNB's logic becomes evident when the Connecticut statute is considered in the light of the congressional decision to entrust to the states the regulation of branching.[16] The ambiguity arising from the statute's lack of guidance regarding the method and manner in which state banks may branch is resolved in part by determining whether the interpretation urged by FNB would result in competitive inequality between state and national banks in Connecticut.[17] Based on the record before us, we agree with the state banking Commissioner, the Comptroller, and the district court that it would.

Although we have found no state court decisions addressing the question whether the statute permits state banks to operate messenger services similar to FNB's, the state Attorney General of Connecticut, on two occasions, has interpreted the Connecticut statute as prohibiting such messenger services. Construing the predecessor to section 36–59 the attorney general stated:

the legislature intended that the term "branch bank" should be construed according to its commonly accepted meaning. Insofar as permanency of location is concerned, a branch bank is no different from a bank. Under our statutes, a bank must operate from definitely fixed locations.... Such [mobile branch banking] units are not within the contemplation of our statutes and cannot be permitted unless definitely and expressly authorized by the legislature.[18]

In a subsequent opinion applying the same provision to a bank's deposit pick-up service, the attorney general concluded:

Bank-supplied pick-up and delivery of depositors' funds from or to the depositor at his place of employment, in our opinion, is in effect an arrangement in the nature of a branch bank operation. Branch banking under our statutes can be established only under certain circumstances and then with approval of the Commissioner. In this particular case, although the operation may be considered branch banking, it is not the type of branch banking contemplated by our statutes since it does not have the permanency as to location which is required.[19]

The attorney general's opinions are not in conflict with the state statute and are entitled to deference.[20]

In short the Connecticut statute does not authorize "affirmatively and not merely by implication or recognition" state banks to operate messenger services like FNB's. Section 36(c) incorporates state law governing not only when and where a branch may be established but also the type and method of branching permitted. We must conclude that the Connecticut statute, as construed by the attorney general, does not authorize FNB's operation of its deposit pickup messenger service in Stamford, the location of its main office, or in outlying areas [21] and, therefore, the service violates 12 U.S.C. § 36(c).

IV

We hold that FNB's messenger service is a branch bank under 12 U.S.C. § 36(f) and that because of Connecticut's limitations on branch banking, FNB's operation of its messenger service violates 12 U.S.C. § 36(c).

16. *Plant City,* 396 U.S. at 133, 90 S.Ct. at 343, 24 L.Ed.2d at 320. *See also Dakota National Bank & Trust Co. v. First National Bank,* 554 F.2d 345, 354 (8th Cir.), *cert. denied,* 434 U.S. 877, 98 S.Ct. 229, 54 L.Ed.2d 157 (1977).

17. *See Independent Bankers of Oregon v. Camp,* 357 F.Supp. 1352 (D.Ore.1973).

18. 27 Conn.Op.Atty.Gen. 33, 35 (1951).

19. 30 Conn.Op.Atty.Gen. 125 (1958).

20. *See, e.g., Plant City,* 400 F.2d 548, 558 (5th Cir., 1968); *Jackson v. First Nat'l Bank of Corne-*

lia, 292 F.Supp. 156, 161 (N.D.Ga.1968), *aff'd,* 430 F.2d 1200 (5th Cir.1970), *cert. denied,* 401 U.S. 947, 91 S.Ct. 933, 27 L.Ed.2d 230 (1971). *See also Lincoln Bank & Trust Co. v. Exchange Nat'l Bank & Trust Co.,* 383 F.2d 694, 699 (10th Cir.1967).

21. We note that to the extent FNB's messenger service operated in towns where state chartered banks have main offices the service also violates the geographic limitations on branching set out in Conn.Gen.Stat.Ann. § 36–59 (West 1988).

We AFFIRM the district court's award of summary judgment to the plaintiff.